# Richmond

## SYDNOR PUMP AND WELL COMPANY, INCORPORATED v. PAUL N. TAYLOR, ET AL.

October 12, 1959.

Record No. 4982.

Present, All the Justices.

The opinion states the case.

*Richard McDearmon* and *Alexander Wellford* (*Alex W. Parker; Christian, Barton, Parker & Boyd,* on brief), for the appellant.

*Leonard L. Lonas, Jr.* and *Percy Thornton, Jr.,* for the appellees.

SPRATLEY, J., delivered the opinion of the court.

This is a statutory appeal from an order of the State Corporation Commission in a proceeding instituted under the provisions of Chapter 10.2 of Title 56, Code of Virginia, entitled "Certain Water and Sewage Systems Not Regulated as Public Utilities." Sections 56-265.10 to 56-265.13, inclusive, 1959 Replacement Volume, Code of Virginia, 1950, Acts 1954, Chapter 669.

The pertinent provisions of the statute read as follows:

"§ 56-265.10. DEFINITIONS—(a) 'Water system' as used herein means any privately owned connected system of mains, pipes, conduits, pumping stations, reservoirs and related facilities furnishing water to fifty or more subscribers for compensation when the person who furnishes the service is not subject to regulation by the Commission as a public utility under chapter 10 (sections 56-232 *et seq.*) of Title 56.

"* * *

"(c) 'Commission' means the State Corporation Commission.

"* * *

"§ 56-265.11. PETITION OF SUBSCRIBERS ALLEGING IN-ADEQUACY OF SERVICE; COMMISSION TO INVESTI-GATE AND FORMULATE OPINION.—If fifty or more of the subscribers, but not more than one from any one household, who have contracts to purchase water from a water * * * system file with the Commission a petition alleging that the service furnished by the system is inadequate and ought to be improved, the Commission shall after notice to the operators of such system investigate the complaint and *formulate an opinion whether in the light of the successful performance of * * * water systems of similar design*

*and purpose, the system is capable of serving the reasonable domestic
needs of the persons or properties served."* (Emphasis added.)

"§ 56-265.12. OPINION OF COMMISSION ADMISSIBLE IN
EVIDENCE—The opinion of the Commission shall be furnished in
writing to the petitioners and to the owners of the water * * * system
and shall be admissible in evidence in any proceedings concerning
contracts between such water * * * system and its subscribers together
with any other evidence which may be offered by either litigant."

On June 25, 1958, Paul N. Taylor and fifty or more subscribers,
who have contracts to purchase water from the water system owned
and operated by Sydnor Pump and Well Company, Incorporated,
in the Dumfries-Triangle area of Prince William County, Virginia,
filed petitions with the State Corporation Commission alleging that
the service furnished by the said system was inadequate and ought
to be improved. By its order entered on the same day, the Commis-
sion ordered an investigation of the complaints set forth in the
petition, "in order to formulate an opinion as to whether, in the light
of the successful performance of water systems of similar design
and purpose, said water system owned and operated by Sydnor
Pump and Well Company, Incorporated, is capable of serving the
reasonable domestic needs of the persons and properties served by
said system."

For the purpose of brevity, the appellant will sometimes herein-
after be referred to as Sydnor; the appellees, Paul N. Taylor and
others, as appellees; the State Corporation Commission as Commis-
sion; and the water system as the Triangle System.

After due notice to all interested parties, a hearing was held by
the Commission on September 3 and 5, 1958. At that hearing, J. K.
Woolfolk, an engineer and a member of the engineering staff of
the Commission, testified that, at the direction of the Commission,
he had made an investigation from July 24 to August 26, 1958, with
respect to the complaints against the Triangle System. He made a
written report, setting out the location of its equipment and facilities,
an inventory thereof, its condition and capacity, and the performance
of the system during the period of his examination. He reported that
Sydnor operated and serviced the system from Richmond, that it did
not keep a service man in the area of the facility; but that trips were
periodically made there by service personnel on telephone calls to
Richmond; that in interviews with water consumers of the system,
the majority of them complained mostly of low pressure, and entire

lack of water at certain times; that others complained of "discolored" or rusty water and its effect on clothes in washing machines; and of excessive air in the water pipes. He concluded his report with the following statement: "With the water supply, mains and equipment as at present, the conclusion is that this water system is not capable of furnishing service to the major part of its consumers, such as a consumer on a system of this kind could reasonably expect."

A number of subscribers to the system testified, without dispute, that they had made numerous complaints about service rendered by the system since 1954, principally in the summertime. They alleged a shortage of water, low pressure of water service, the presence of air, iron and rust in the water, and the failure of prompt repairs when the system was disrupted by breakage of pipes or loss of pumping power, because of lack of local service personnel.

It was shown that the Triangle System began operation in October, 1947, under a written master agreement or contract between Sydnor and B. F. Warren and his wife, the latter two acting on behalf of themselves and other persons in the Triangle area, who desired to become connected with the water system. The contract provided that for an agreed consideration Sydnor would, subject to the terms and conditions thereof, furnish the domestic and commercial needs of its customers with a supply of water "adequate for their domestic (including lawn purposes) and business needs."

From time to time thereafter numerous subscribers were added to the system. Originally there were thirty or more consumer connectors, and as of the summer of 1958, there was a total of five hundred and twenty-two, of whom four hundred and ninety-eight were active.

Evidence presented by Sydnor showed that the system had been increased by nine or ten wells and that a number of others were kept as standbys because of low productivity; that improvements and enlargements in the mains, pumping stations, and storage tanks had been made from time to time; that the system had a productive capacity of some six million gallons per month, or two hundred thousand gallons per day; that consumption approximated one hundred sixty thousand gallons daily; and that there was a storage capacity of more than two hundred thousand gallons, exceeding the daily consumption by twenty-five per cent.

Sydnor attributed the storage of water and loss of pressure to unreasonable consumption by the subscribers and to pipe breakage

and power failure, over which it had no control. It showed that the water consumption in the Dumfries-Triangle area was one hundred sixty thousand gallons per day, an average of nine thousand gallons per connector per month, as compared with the consumption of less than six thousand gallons per month per connector in eighty other similar Sydnor-owned and operated systems, and with an average of six thousand five hundred gallons per month per connector for various similar systems owned and operated by towns in Virginia. However, there is nothing in the evidence to explain the difference in consumption per connector.

Sydnor showed that a sewer contractor laying sewers in the above area caused several pipe breakages in the summer of 1958. During the period between July 24 and August 26, 1958, when the system was being investigated by Engineer Woolfolk, there were seven known pipe breakages, six from sewer and one from highway construction. There were a number of other pipe breakages in 1958, which caused a loss of water storage and pressure. Pump failure due to lack of electric power at other times contributed to the same result. As a consequence, water in the storage tanks was consumed and time was required after repairs had been effected to refill the tanks.

On October 3, 1958, the Commission entered its opinion and finding in a final order. It held that the system "is not capable of serving the reasonable domestic needs of the persons served by it; that 'reasonable domestic needs' means all the water domestic consumers actually use for domestic purposes; that the word 'reasonable' excludes only water that is wasted;" that while Sydnor proved "more water is being used per connection in this system than in others," such "falls short of proving that more water is used per capita or that the consumers are wasting water in any significant amounts;" that Sydnor should have provided a local service man for such emergencies as pipe breakages and power failures, because of the difficulty in reaching someone in Richmond to restore service; that it failed to equip its motors with automatic starters; that the water contained too much iron; that under the circumstances, the "addition of new commercial users is a serious breach of contract;" and that the statute was enacted because of complaints against several water systems operated by Sydnor. It ordered that the proceedings be dropped from the docket, and the file placed with the ended causes; and that an attested copy be furnished counsel for the parties.

Sydnor complains first, that the Commission exceeded its authority in finding that Sydnor had breached its contract with its subscribers and that Chapter 10.2 of Title 56 was enacted because of Sydnor; second, that the Commission did not properly ascertain the "reasonable domestic needs of the persons served by the system," in the light of the successful performance of water systems of similar design and purpose, as provided by the statute; and, third, in finding that there was too much iron in the water.

■ The evidence amply supports the finding of the Commission that the water system, at the time of the hearing, was not capable of serving the reasonable domestic needs of the persons and properties served by it.

It was shown that the system had ample storage facilities but not enough water; that new water consumers added a further burden to the system; that a failure to provide local service personnel extended the periods of water shortage or power failure; and that there was an excess quantity of iron in the water in some parts of the system.

■ The question remaining for our decision is whether the Commission exceeded its authority in making the findings complained of in Sydnor's first two contentions. This brings us to a consideration of sections 56-265.11 and 56-265.12.

The provision of Code, § 56-265.12 permitting the admission of the opinion of the Commission in evidence in proceedings concerning contracts between the water system and its subscribers is an exception to the common law rules of evidence. The statute is remedial, and, at the same time, in derogation of the common law; and, therefore, must be strictly construed. *O'Connor* v. *Smith*, 188 Va. 214, 222, 49 S. E. 2d 310; *Sellers* v. *Bles*, 198 Va. 49, 53, 92 S. E. 2d 486; 17 M. J., Statutes, sections 68 and 69, page 331.

Moreover, administrative agencies, in the exercise of their powers, may validly act only within the authority conferred upon them by statutes vesting power in them. 42 Am. Jur., Public Administrative Law, § 99, page 428; 73 C. J. S., Public Administrative Bodies and Procedure, § 59, page 383.

Code, § 56-265.11 does not empower the Commission to determine and adjudicate the rights and liabilities of parties to contracts between a privately owned water system and its consumer connectors, or to enforce the provisions of such contracts. It does not authorize the Commission to formulate an opinion as to whether a water system

has complied with its contracts with its customers. The question whether a contract has been breached is for the courts to determine. *Newport News Light & Water Co.* v. *Peninsular Pure Water Co.*, 107 Va. 695, 59 S. E. 1099; *Norfolk and Western Ry. Co.* v. *Commonwealth*, 143 Va. 106, 113, 114, 129 S. E. 324; *Lynchburg* v. *Commonwealth*, 164 Va. 57, 63, 64, 178 S. E. 769. The Commission is only authorized to investigate the complaints filed and to "formulate an opinion whether in the light of the successful performance of * * * water systems of similar design and purpose, the system is capable of serving the reasonable domestic needs of persons or properties served." The jurisdiction of the Commission under Chapter 10.2 of Title 56 is confined to the issue of the capability of the water system under investigation and not to the question whether the water system has fulfilled its contracts with its consumer connectors.

Nor does the above section authorize the Commision to formulate an opinion as to why Chapter 10.2 of Title 56 was enacted. The statute applies to all water systems coming within the definition of § 56-265.10. It was obviously enacted to protect the public health in all communities served by such water systems by putting on the Commission the burden of ascertaining the fact whether such systems had the capacity of serving the reasonable domestic needs of the persons or properties served, in the light of the successful performance of water systems of similar design and purpose.

There is no evidence in the record with respect to the "performance" of other similar systems. There was a comparison of consumption by connectors daily and monthly in a number of mentioned similar systems; but this comparison falls short of showing the manner of performance of the various systems. Engineer Woolfolk, who made an investigation for the Commission, filed no report of the performance of systems of similar design and purpose, and no witnesses testified as to the performance of such other systems, save as to consumption per connector or consumption per system.

A holding that "reasonable domestic needs" means "all the water that domestic consumers actually use for domestic purposes" is too broad. The word "reasonable" excludes water that is wasted, and water "actually used" may be immoderate and excessive.

The words "reasonable" and "needs" are relative terms with no fixed or rigid meaning; but are not ambiguous. In ordinary use and common acceptation, the word "reasonable" means "fair; just;

ordinary or usual; not immoderate or excessive; not capricious or arbitrary." It means what is "just, fair and suitable under the circumstances." 75 C. J. S., Reasonable, pages 634, 635; Webster's New International Dictionary, Second Edition. The word "need" implies "A condition requiring supply or relief." It means all that one requires for relief, and is synonymous with "adequate" for the requirements. 65 C. J. S., Need, page 273; Webster's New International Dictionary, Second Edition.

For the reasons stated, the order of the Commission is set aside; its opinion vacated; and the case remanded for such further action as may be deemed proper and necessary, in accordance with the views herein expressed.

*Reversed and remanded.*