## Arlington

BIO-MEDICAL APPLICATIONS OF ARLINGTON, INC.,

v.

JAMES B. KENLEY, M.D., et al.

No. 0704-85

Decided July 7, 1987

COUNSEL

John J. Miles; Jo Ellen Ojeda (Guy Collier, James C. Pyles; Powers, Pyles, Sutter & O'Hare, Susan S. Dunn; National Medical Care, Inc., on briefs), for appellant.

John A. Rupp, Senior Assistant Attorney General (William G. Broaddus, Attorney General; Carol S. Nance, Assistant Attorney General, on brief), for James B. Kenley, M.D.

Jessica Sanders Jones (Virginia H. Hackney; Hunton & Williams, on brief), for Fairfax Dialysis-CAPD Center, Inc.

OPINION

**KEENAN, J.** — Bio-Medical Applications of Arlington, Inc. (Bio-Medical), appeals from a circuit court decision upholding the State Health Commissioner's (Commissioner) denial of its application for a certificate of public need (CON) to expand its renal dialysis facility in Arlington County. The CON was awarded instead to Fairfax Dialysis-CAPD Center, Inc. (Fairfax Dialysis). The issues on appeal are: (1) whether the trial court erred in holding that the comparative consideration given to Bio-Medical's application and the application of Fairfax Dialysis was acceptable within the provisions of Virginia administrative procedure; and (2) whether the trial court erred in finding substantial evidence in the record to support the Commissioner's decision. Finding no reversible error, we affirm the decision of the court.

I.

Bio-Medical is a six station, free-standing maintenance dialysis facility located in Arlington County. On September 10, 1982, it applied for a CON to add six beds to its existing facility. Five other facilities, including Fairfax Dialysis, also applied for a CON to add maintenance dialysis stations to their facilities in the Northern Virginia area (Planning District 8).[1]

The applicants' proposals were initially reviewed by the staff of the Health Systems Agency of Northern Virginia (HSA). The staff estimated that at least five additional stations for end stage renal disease (ESRD) would be needed in Northern Virginia by December 1983. Springfield, where Fairfax Dialysis proposed to establish a new six station outpatient dialysis facility, was found to be more accessible to a greater number of patients and physicians than the other proposed locations.

Bio-Medical was criticized by the HSA staff for failing to operate an evening shift and for being the only applicant to maintain a closed medical staff.[2] As explained in the HSA staff analysis:

---

[1] Also applying for a CON were Fairfax Hospital Association, Mid-Atlantic Nephrology Center, Ltd., Northern Virginia Dialysis Center, Inc., and Prince William Dialysis Facility, Inc.

[2] The significance of having a closed medical staff was explained as follows:
Staffing practices at ESRD facilities also can affect access, continuity and acceptability of care. A facility that maintains a closed medical staff necessarily restricts

Because of the closed medical staff, approval of the [Bio-Medical] expansion would not promote accessibility, acceptability, continuity of care, competition or patient choice. Approval of an additional open staffed facility in the Springfield area would, in contrast, promote competition and patient choice as well as be consistent with an appropriate geographic distribution of capacity.

Regarding costs, the HSA staff concluded: "Data on home training rates indicates that the principal physicians involved with Prince William Dialysis Facility and Fairfax Dialysis-CAPD Center are more likely than the others to promote the less costly treatment setting for the greatest number of suitable patients."

On January 3, 1983, a public hearing was held before the Project Review Committee of the HSA. Each applicant presented its case after which the agency staff recommended approval of the Fairfax Dialysis proposal. The Project Review Committee voted unanimously to recommend denial of Bio-Medical's application and voted 3-1 to recommend approval of Fairfax Dialysis' application.

On January 10, 1983, the HSA Board of Directors met and voted to recommend denial of the Fairfax Dialysis application. The Board voted to recommend approval of "an amended application from Bio-Medical Applications of Northern Virginia for three additional stations, with the unit to operate a fifth shift and to have an open medical staff for all qualified physicians." The HSA Board also recommended approval for a three station expansion of the Prince William Dialysis Facility.

On January 18, 1983, the Statewide Health Coordinating Council (SHCC) recommended denial of Bio-Medical's application, but recommended approval for an amended application from Bio-Medical limiting expansion to three stations. Although Bio-Medical indicated its willingness to amend its application in accordance with the recommendations of the SHCC and the HSA

patient care by the physician of choice for many patients. Patients of physicians who are unable to obtain privileges at the facility most convenient to the patient are forced either to change physicians, thereby disrupting continuity of care and perhaps reducing the acceptability of care, or to travel greater distances to receive care from the physician of choice, greatly reducing access and acceptability of care, and increasing out-of-pocket costs.

Board, it does not appear from the record that such an amendment was ever made.

On February 8, 1983, the Commissioner issued a CON to Fairfax Dialysis. The Commissioner concluded that the Fairfax Dialysis application "represents the best alternative for establishing additional ESRD capacity" within the planning district.

Bio-Medical's application was denied on the same date that the Fairfax Dialysis application was approved. Noting that Bio-Medical never amended its application in accordance with earlier recommendations, the Commissioner considered Bio-Medical's application on the basis of its request for a six station expansion. Four reasons were given by the Commissioner for denying Bio-Medical's application:

It has not been demonstrated that the addition of renal dialysis stations is the best alternative to increasing the facility's capacity.

The proposal is not consistent with the State Medical Facilities Plan standards and criteria for ESRD services.

The proposed project does not represent the best alternative for establishing additional ESRD capacity within Planning District 8.

The proposed project is not consistent with the ESRD need projections in the State Medical Facilities Plan once these projections are adjusted for the approval of a competing application.

Pursuant to former Code § 32.1-102.6(F)[3] Bio-Medical appealed the Commissioner's denial of its application. In accordance

---

[3] Code § 32.1-102.6(F) was repealed as of July 1, 1984. It provided:

1. Informal proceedings provided for in § 9-6.14:11 of the Code shall be held, in the case of an application for a certificate, upon request of the applicant, any person showing good cause, any third party payor providing health care insurance or prepaid coverage to five percent or more of the patients in the applicant's service area, or the health systems agency if the initial determination was contrary to its recommendation and, in the case of revocation of a certificate, upon request of the person whose certificate is being revoked. The request shall be filed with the Commissioner within thirty days after the initial determination. Such proceedings shall commence within thirty days of the receipt of such request. Formal proceedings provided for in § 9-6.14:12 of the Code shall be held upon request, filed with the Commissioner within fifteen days after the decision in the informal

with state regulation, operation of the CON awarded to Fairfax Dialysis was suspended pending the administrative appeals process.[4] Bio-Medical did not appeal the Commissioner's award of a certificate of need to Fairfax Dialysis, although it could have done so. Fairfax Hospital Association and the HSA did appeal the Commissioner's award of the CON to Fairfax Dialysis.

Pursuant to Code § 9-6.14:11 an informal fact-finding conference was held on April 5, 1983, regarding the Commissioner's decision to award a CON to Fairfax Dialysis. The next day an informal fact-finding conference was held regarding the decision to deny Bio-Medical's application. Both conferences were held before Assistant State Health Commissioner Bedford H. Berry, M.D.. Berry recommended affirmance of the Commissioner's decision in both instances.

The Commissioner adopted the findings and conclusions of the Assistant Commissioner's report and affirmed the decision to deny Bio-Medical's application. Bio-Medical then requested a formal evidentiary hearing pursuant to Code § 9-6.14:12. The hearing was held on November 28, 1983. Assistant State Health Commissioner Raymond D. Perry acted as the hearing officer.

On March 6, 1984, Perry issued his recommendation that the Commissioner affirm the decision to deny Bio-Medical's application. Perry summarized Bio-Medical's arguments and made findings of fact. He explained his recommendation as follows:

proceedings, of the applicant, of any third party payor providing health care insurance or prepaid coverage to five percent or more of the patients in the applicant's service area, or of the health systems agency if the decision following the informal proceedings was contrary to its recommendation or, in the case of revocation, by the person whose certificate is being revoked. Such proceedings shall commence within thirty days of the receipt of such request. Both the informal and formal proceedings shall be public proceedings.

2. For purposes of this subsection, "good cause" shall mean that (i) there is significant, relevant information not previously considered, (ii) there have been significant changes in factors or circumstances relied upon in reaching the determination whether to issue a certificate, or (iii) material procedures have not been followed in reaching the determination whether to issue a certificate.

3. A decision including the reasons therefor shall be issued within thirty days after completion of the informal proceedings pursuant to § 9-6.14:11 or after any formal proceedings pursuant to § 9-6.14:12, whichever is applicable.

[4] Certificate of Need Regulation § 10.01.03 provided:

Upon receipt of a request for an informal fact-finding conference, the Department shall notify the applicant Health Systems Agency and competing applicant and suspend the [CON] in question.

In tendering this recommendation, I am mindful that the applicant has been given sufficient opportunity to amend its application to a number that was consistent with the projections for additional ESRD Dialysis Station Capacity for the Northern Virginia Health Services Area as set forth in the State Medical Facilities Plan and the Health Systems Plan of the Northern Virginia Systems Agency (HSA). Such projections included the authorization for the Fairfax Dialysis CAPD Facility, Inc. Given the continued refusal of the applicant to amend its application, the Commissioner approved a five station expansion for the Prince William Dialysis Facility in Woodbridge, Virginia. Approval of this facility fulfilled the projected need as set forth in the State plans. The Commissioner, the HSA and the Statewide Health Coordinating Council had all expressed a willingness to approve a project up to a three station expansion for the BMA facility in Arlington, Virginia. More specifically, such an offer was proffered prior to the initial determination until the date of the decision on the Prince William Dialysis proposal on November 7, 1983.

Based on Perry's recommendation, the Commissioner again affirmed his decision to deny Bio-Medical's application. This decision was appealed to the Circuit Court of Arlington County. Argument was heard on December 17, 1984, and the court rendered its decision by letter opinion on March 29, 1985. The court affirmed the Commissioner's decision and rejected Bio-Medical's argument that it had been denied the right to a comparative hearing on the merits of its application versus the application of Fairfax Dialysis. The court held:

In the absence of a clear authority in Virginia on this issue and in view of the split found elsewhere, this Court is unable to conclude that a comparative consideration beyond that which was done here is required by Virginia law. The Court is, therefore, satisfied that there was a minimal but acceptable comparative review here albeit without a formal comparative hearing which the Court deems in this case not to have been required by Virginia law.

## II.

Bio-Medical argues that the Commissioner erred in failing to provide a formal comparative hearing on the merits of the competing CON applications. It argues that such a hearing is required by standards of due process as set out in *Ashbacker Radio Corp. v. FCC*, 326 U.S. 327 (1945) and by the formal review proceedings provided for in former Code § 32.1-102.6(F). According to Bio-Medical, the Commissioner's failure to consider the comparative merits of the applications when making his initial determination is demonstrated by his finding that Bio-Medical's project was "not consistent with the ESRD need projections in the State Medical Facilities Plan *once these projections are adjusted for the approval of a competing application.*" (emphasis added). Bio-Medical further argues that this alleged error was compounded by the Commissioner's failure to hold a formal comparative hearing during the review process following his initial determination.

■ We agree that Bio-Medical was entitled to have its application considered in a comparative manner with all other applications prior to the Commissioner's award of a CON to one of the applicants. Where, as here, applications for a public license are mutually exclusive a comparative process, such as is mandated for federal licensing decisions by the United States Supreme Court's *Ashbacker* decision, is required to insure a fair hearing. We do not agree, however, that the method used by the Commissioner for reviewing CON applications violated either former Code § 32.1-102.6(F) or the *Ashbacker* doctrine.

In *Ashbacker*, the Supreme Court considered "whether an applicant for a construction permit under the Federal Communications Act . . . is granted the hearing to which he is entitled by § 309(a) of the Act where the Commission, having before it two applications which are mutually exclusive, grants one without a hearing and sets the other for hearing." 326 U.S. at 327-28 (footnote omitted). The Court answered in the negative.

Briefly stated, the facts in *Ashbacker* reveal that the FCC had declared that two applications for permission to construct a radio station were mutually exclusive because, if both were constructed, intolerable interference would result. The Commission granted one application (Fetzer) without a hearing and then scheduled a

hearing on Ashbacker's application. One issue to be determined at the hearing was whether simultaneous operation of the two stations would result in interference. The Commission did not suspend operation of the Fetzer application pending consideration of Ashbacker's application. *Id.* at 331.

The Court stated:

> Since the Commission itself stated that simultaneous operation of the two stations would result in "intolerable interference" to both, it is apparent that petitioner carries a burden which cannot be met. To place that burden on it is in effect to make its hearing a rehearing on the grant of the competitor's license rather than a hearing on the merits of its own application.

*Id.* at 330-31.

The Court further stated:

> As the Fetzer application has been granted, petitioner, therefore, is presently in the same position as a newcomer who seeks to displace an established broadcaster. By the grant of the Fetzer application petitioner has been placed under a greater burden than if its hearing had been earlier. Legal theory is one thing. But the practicalities are different.

*Id.* at 332.

The Court concluded:

> We are not concerned here with the merits. This involves only a matter of procedure. Congress has granted applicants a right to a hearing on their applications for station licenses. Whether that is wise policy or whether the procedure adopted by the Commission in this case is preferable, is not for us to decide. We only hold that where two bona fide applications are mutually exclusive, the grant of one without a hearing to both deprives the loser of the opportunity which Congress chose to give him.

*Id.* at 333 (footnote omitted).

We hold that Bio-Medical received comparative consideration of its application in compliance with the principles of *Ashbacker*. Unlike the agency action in *Ashbacker*, the Commissioner here did not make an award to one applicant *prior* to affording a hearing to the others. As noted in the hearing officer's recommendation of March 6, 1984:

> These five applications were all considered in the same review cycle pursuant to Section 6.05 of the Certificate of Public Need Rules and Regulations. Therefore, the rationale for approval or denial of the applications by all sources is based on the concurrent review of the proposals, evaluating each on its individual merits and then in comparison to the other applications.

The record in this case demonstrates that the Commissioner's initial determination was made following a comparative review of the competing applications. Initially the HSA staff individually and comparatively analyzed each application. The staff report of December 27, 1982, which considered all five competing proposals against several objectives, amply demonstrates the comparative nature of its analysis. Further, the public hearing before the HSA Project Review Committee on January 3, 1983, provided each applicant an opportunity to present its case in a comparative setting. In addition, a SHCC staff analysis was prepared which specifically evaluated the applications in a comparative fashion against the standards of the State Medical Facilities Plan.

Finally, the Commissioner's letters of February 8, 1983 granting the application of Fairfax Dialysis and denying Bio-Medical's application reflect a comparative process. The letters were issued on the same day and included the Commissioner's findings that the Fairfax Dialysis project represented "the best alternative for establishing additional. ESRD capacity within Planning District 8," while the Bio-Medical project did not "represent the best alternative." These references to alternatives clearly demonstrate that the Commissioner considered all the applications prior to awarding a CON to Fairfax Dialysis.

The Commissioner's letter to Bio-Medical included a finding that its application was not consistent with the ESRD need projections "once these projections are adjusted for the approval of a competing application." When read in isolation this phrase could,

as argued by Bio-Medical, support the inference that the Commissioner denied Bio-Medical's application because of the award of a CON to the mutually exclusive application of Fairfax Dialysis. This one phrase, however, must be read in the context of the entire letter. Prior to this finding the Commissioner gave three independent reasons for denying Bio-Medical's application. Specifically, the Commissioner found that Bio-Medical had not demonstrated that addition of renal dialysis stations was the best alternative to increasing its capacity; that its proposal was not consistent with the State Medical Facilities Plan standards and criteria for ESRD services; and, that its proposal did not represent the best alternative for establishing additional ESRD capacity within Planning District 8.

These findings alone constituted sufficient reason for the Commissioner's decision to deny Bio-Medical's application. The Commissioner's further finding regarding need projections did not imply that he had failed to make a comparison of the competing applications. It only stated his conclusion that, by granting an alternative application, which he believed was better, the projected need for ESRD services in Planning District 8 would be satisfied.

After Bio-Medical appealed the Commissioner's initial determination, the informal and formal review process provided for in former Code § 32.1-102.6(F) took place. In accordance with CON Reg. 10.01.03, the Commissioner suspended his award of the CON to Fairfax Dialysis. This action further distinguishes the present case from *Ashbacker* where the agency did not suspend its initial award pending review of the competing application.

Bio-Medical argues that it was denied a "full, fair comparative formal evidentiary hearing," as mandated by the Code and *Ashbacker*. While under the *Ashbacker* principles, Bio-Medical was entitled to comparative consideration of its application throughout the review process, we disagree that it was denied such a review. We further reject Bio-Medical's argument that it was entitled to a consolidated comparative hearing on the merits of its application versus the application of Fairfax Dialysis.

■ The *Ashbacker* doctrine does not impose any particular method for ensuring compliance with its holding that mutually exclusive applications be given comparative consideration. Instead, "the *Ashbacker* rule is basically a rule of fairness in comparative

consideration . . . [and] it must be applied with common sense and in a practical fashion." *Delta Airlines v. Civil Aeronautics Board*, 497 F.2d 608, 612-13 (D.C. Cir. 1973), *cert. denied*, 417 U.S. 930 (1974). Further, "*Ashbacker* has never been held to be constitutionally required specifically, but has been used to give meaning to legislative schemes where the problem of mutual exclusiveness of licenses is presented." *Huron Valley Hospital, Inc. v. Michigan State Health Facilities Commission*, 110 Mich. App. 236, _____, 312 N.W.2d 422, 426 (1981). As stated in *Bio-Medical Applications of Clearwater, Inc. v. Department of Health and Rehabilitative Services*, 370 So. 2d 19, 25 (Fla. Dist. Ct. App. 1979), "it is for an administrative agency to devise means of achieving comparative consideration, including an appropriate mechanism for determination by the agency whether *Ashbacker* requires a comparative hearing in a particular case."

The Virginia statutory scheme afforded Bio-Medical a formal evidentiary hearing on the merits of its application after the initial decision by the Commissioner. A hearing at such time would come too late under the *Ashbacker* doctrine if the Commissioner's initial determination remained in effect. In such a case, Bio-Medical's statutory right to a formal hearing would be nothing more than a rehearing on the decision to award a CON to Fairfax Dialysis. This is exactly what the *Ashbacker* decision sought to avoid. To the extent the Commissioner argues that Bio-Medical was entitled to nothing more than a rehearing on the decision to award a CON to Fairfax Dialysis, we disagree.

The record shows that Bio-Medical received a fair comparative review of its application at both the informal and formal review hearings conducted pursuant to former Code § 32.1-102.6(F). The recommendations of both hearing officers following the informal and formal hearings were not based upon the Commissioner's initial decision to award a CON to Fairfax Dialysis. Instead they were based upon a review of Bio-Medical's compliance with the statutory criteria related to the granting of a CON. Both hearing officers recommended that the Commissioner affirm his initial adverse determination based on Bio-Medical's failure to comply with these criteria.

Assistant Commissioner Perry specifically dealt with Bio-Medical's argument that it had been denied a comparative review. He wrote:

The appellant alleges that the Commissioner erred, in part, because he failed to evaluate the BMA proposal and the Fairfax Dialysis CAPD Facility, Inc. as competing projects at the informal appeal level. The fact that the Commissioner suspended the Certificate issued to the Fairfax Dialysis CAPD Facility, Inc. refutes the appellants argument. Additionally, there is not sufficient evidence in the record to substantiate the appellant's argument's [sic] that the approval of the competing applicant be reversed. Therefore, it is my judgment that the following reasons used by the Commissioner to approve initially the Fairfax Dialysis CAPD Facility, Inc. proposal over the BMA proposal and the other competing applicants remain valid:

> The proposed project represents the best alternative for establishing additional ESRD capacity within Planning District 8.

> The proposed project is consistent with the ESRD need projections in the State Medical Facilities Plan.

> The proposed project will improve accessibility to ESRD services in the health service area.

Neither the *Ashbacker* decision nor former Code § 32.1-102.6(F) require a consolidated hearing on competing mutually exclusive applications. While fairness demands that all applicants be heard on an equal basis, no specific method for achieving this result is mandated. We find that in the present case Bio-Medical was given a fair, comparative review of its application in compliance with Virginia law and the principles of the *Ashbacker* decision.

### III.

We turn now to the question whether there is substantial evidence in the record to support the Commissioner's decision. Our standard of review is well defined by statute and case law. The burden is upon the party complaining of an agency action to demonstrate an error of law subject to review. Code § 9-6.14:17; *Roanoke Memorial Hospitals v. Kenley*, 3 Va. App. 599, 603, 352 S.E.2d 525, 527 (1987).

 Among the issues of law subject to review is "the substantiality of the evidential support for findings of fact." Code § 9-6.14:17(4). Where, as here, there has been a formal hearing pursuant to Code § 9-6.14:12, the determination of factual issues is to be made "upon the whole evidential record provided by the agency." Code § 9-6.14:17(4). The scope of review is limited to whether there was "substantial evidence in the agency record" to support the decision. *State Board of Health v. Godfrey*, 223 Va. 423, 433, 290 S.E.2d 875, 879-80 (1982). "The phrase 'substantial evidence' refers to 'such relevant evidence as a reasonable mind *might* accept as adequate to support a conclusion.'" *Virginia Real Estate Commission v. Bias*, 226 Va. 264, 269, 308 S.E.2d 123, 125 (1983)(quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "[T]he court may reject the agency's findings of fact 'only if, considering the record as a whole, a reasonable mind would *necessarily* come to a different conclusion.'" *Bias*, 226 Va. at 269, 308 S.E.2d at 125 (quoting B. Mezines, *Administrative Law* § 51.01 (1981)). This standard is designed "to give great stability and finality to the fact-findings of an administrative agency." *Bias*, 226 Va. at 269, 308 S.E.2d at 125.

 In addition, the court must review the facts in the light most favorable to sustaining the Board's action and "take due account of the presumption of official regularity, the experience and specialized competence of the agency, and the purposes of the basic law under which the agency has acted." Code § 9-6.14:17; *Virginia ABC Commission v. York Street Inn, Inc.*, 220 Va. 310, 313, 257 S.E.2d 851, 853 (1979).

In the present case, we reject Bio-Medical's argument that the Commissioner erred in failing to make specific findings on all twenty factors which he is required to consider under Code § 32.1-102.3(B). While that statute requires the Commission to *consider* all twenty factors, it does not require specific findings on each. Indeed, not all twenty factors may be relevant to every application for a CON.[5] It is sufficient that the Commissioner's decision "briefly state or recommend the findings, conclusions, reasons, or basis therefor upon the evidence presented by the record

---

[5] The version of Code § 32.1-102.3(B) in effect at the time stated:

B. In determining whether a public need for a project has been demonstrated, the Commissioner shall consider:

and relevant to the basic law under which the agency is operat-

1. The recommendation and the reasons therefor of the appropriate health systems agency and any recommendation and the reasons therefor of the Statewide Health Coordinating Council.

2. The relationship of the project to the applicable health plans of the Board, the health systems agency, and the Statewide Health Coordinating Council.

3. The relationship of the project to the long-range development plan, if any, of the person applying for a certificate.

4. The need that the population served or to be served by the project has for the project.

5. The extent to which the project will be accessible to all residents of the area proposed to be served.

6. The area, population, topography, highway facilities and availability of the services to be provided by the project in the particular part of the health service area in which the project is proposed.

7. Less costly or more effective alternate methods of reasonably meeting identified health service needs.

8. The immediate and long-term financial feasibility of the project.

9. The relationship of the project to the existing health care system of the area in which the project is proposed.

10. The availability of resources for the project.

11. The organizational relationship of the project to necessary ancillary and support services.

12. The relationship of the project to the clinical needs of health professional training programs in the area in which the project is proposed.

13. The special needs and circumstances of an applicant for a certificate, such as a medical school, hospital, multidisciplinary clinic, specialty center or regional health service provider, if a substantial portion of the applicant's services or resources or both is provided to individuals not residing in the health service area in which the project is to be located.

14. The special needs and circumstances of health maintenance organizations.

15. The special needs and circumstances for biomedical and behavioral research projects which are designed to meet a national need and for which local conditions offer special advantages.

16. In the case of a construction project, the costs and benefits of the proposed construction.

17. The probable impact of the project on the costs of and charges for providing health services by the applicant for a certificate and on the costs and charges to the public for providing health services by other persons in the area.

18. Improvements or innovations in the facilities proposed to be provided, the efficiency and appropriateness of the use of existing services and facilities in the area similar to those proposed.

19. In the case of health services or facilities proposed to be provided, the efficiency and appropriateness of the use of existing services and facilities in the area similar to those proposed.

20. The need and the availability in the health service area for osteopathic and allopathic services and facilities and the impact on existing and proposed institutional training programs for doctors of osteopathy and medicine at the student, internship, and residency training levels.

ing." Code § 9-6.14:12(E). The Commissioner's decision must show that due consideration was given to the evidence bearing upon those factors which were relevant to the application under consideration. We find that the Commissioner's decision here, adopting the findings and conclusions of the hearing officer, complies with this standard.

Turning to the evidence presented and the Commissioner's reasons for denying Bio-Medical's application, we find sufficient evidence in the record, as a whole, to support his decision. The Commissioner's initial determination, which was ultimately affirmed following informal and formal hearings, was based on findings that Bio-Medical had not demonstrated that the addition of renal dialysis stations represented the best alternative to increasing its capacity; that its proposal was not consistent with the State Medical Facilities Plan standards and criteria for ESRD services; that its project did not represent the best alternative for establishing additional ESRD capacity within Planning District 8; and, that its project was not consistent with the ESRD need projections in the State Medical Facilities Plan once the projections were adjusted for the approval of a competing application.

Support for these conclusions is found in the analysis of the original six competing applicants prepared by the HSA staff. Further support is found in the testimony of George Barker, Associate Director of that agency. Barker testified on behalf of the Commonwealth at the formal hearing. Finally, support for the Commissioner's decision is found in the staff analysis of the Statewide Health Coordinating Council's Health Facilities & Services Review Committee.

The HSA staff evaluated each proposal under the guidelines of the State Medical Facilities Plan. It found that at least five additional stations would be needed in Planning District 8 and its analysis of patient origin data and travel times "indicate[d] that of the proposed locations, the Springfield area [where Fairfax Dialysis proposed to locate its facility] would be accessible to a greater number of patients and physicians." The staff further stated: "[G]rowth pattern[s] suggests it would be imprudent to develop additional capacity now in Arlington [where Bio-Medical is located] or northern Fairfax County. Growth should be targeted toward the growing dialysis population."

Bio-Medical disputes that the greatest need for additional ESRD capacity is in Alexandria, pointing out that the Northern Virginia Dialysis Center, a competing facility located in Alexandria, was found to have an excess of capacity. However, the substance of George Barker's testimony at the formal hearing indicated that, despite under utilization of the Northern Virginia Dialysis Center, the greatest concentration of dialysis patients remains in Alexandria.

According to Barker, roughly half of the patients in Alexandria travel outside the immediate area for treatment because "for a variety of reasons" they did not wish to use the Northern Virginia Dialysis Center. Barker testified that the HSA believed a new facility in Alexandria would be used because the tendency of Alexandria residents to leave the area for treatment only recently occurred and they continued to seek other medical services within the general Alexandria area. Barker further testified that the HSA had received letters of support for the Fairfax Dialysis application from patients in the Alexandria area.

Addressing the tendency of Alexandria residents to seek treatment elsewhere despite the presence of the Northern Virginia Dialysis Center, Barker stated:

> We [HSA] believe it is important to develop additional capacity in that area [Alexandria] to serve the patients there so they have an option or choice within that particular area and that they are not put in a position where large numbers of them are traveling outside the area to the other three facilities.

As noted previously, the HSA staff also favored Fairfax Dialysis over Bio-Medical on the grounds that Bio-Medical restricted patient access by maintaining a closed medical staff and by not offering patients an evening shift. In addition, although the recommended standard in the State Medical Facilities Plan for shifts in existing facilities is two and one-half, Bio-Medical operates only two shifts. The hearing officer noted that Bio-Medical could increase capacity within its currently authorized number of stations by adding a third shift.

The SHCC staff reported that due to limited shifts, Bio-Medical was not in compliance with the State Medical Facilities Plan

standards for acceptability and accessibility. The SHCC staff further noted that all the other applicants did comply with these standards. As reported in the SHCC analysis, Bio-Medical "ascertains that its current shifts are convenient to its present patient population, but does not explain why a 2.5 shift might not be beneficial to new patients."

Bio-Medical asserts that it is prepared to change its policies to satisfy these complaints, and in fact the HSA recommended approval of a portion of Bio-Medical's application (3 stations) provided these changes were made. However, as noted by the hearing officer, no formal amendment was ever made to Bio-Medical's application reflecting its intention to open its staff and offer additional shifts. We believe that the Commissioner was entitled to act upon the application as it existed without regard to Bio-Medical's promise to amend its application.

Regarding the issue of costs, the HSA staff reported that all six applicants demonstrated that a profit could be made by the second year. It noted, however, that "planned reductions in [Medicare reimbursement] rates . . . may make the economic feasibility of the units with low rates of home training questionable." The staff explained that "[u]nder the existing and planned Medicare reimbursement systems, total public expenditures for dialysis are reduced when patients dialyze at home." It concluded that "[d]ata on home training rates indicate that the principal physicians involved with Prince William Dialysis Facility and Fairfax Dialysis-CAPD Center are more likely than the others to promote the less costly treatment setting for the greatest number of suitable patients."

Summarizing the comparative merits of each proposal, the HSA staff concluded:

> The proposed Fairfax Dialysis-CAPD Center is preferable to the other applications under review based on its location, its operation of an open medical staff and an average of 2.5 shifts, six days a week, the potential for Medicare program savings through encouragement of home dialysis based on the home training rates of the proposed facility's principal physicians, the existence of referrals, and indications of community support.

Our review of this evidence and the entire agency record satisfies us that the Commission's decision was supported by "such relevant evidence as a reasonable mind *might* accept as adequate to support a conclusion." *Bias*, 226 Va. at 269, 308 S.E.2d at 125. Accordingly, we find substantial evidence in the record to support the Commissioner's decision. We therefore affirm the ruling of the circuit court which upheld the Commissioner's decision.

*Affirmed.*

Benton, J., and Duff, J., concurred.