COURT OF APPEALS OF VIRGINIA


Present:  Judges Benton, Bray and Senior Judge Overton
Argued at Norfolk, Virginia


SENTARA NORFOLK GENERAL HOSPITAL
                                        OPINION BY
v.      Record No. 1798-98-1    JUDGE NELSON T. OVERTON
                                        JULY 27, 1999
STATE HEALTH COMMISSIONER
and
EASTERN VIRGINIA HEALTH SYSTEMS AGENCY, INC.


            FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
                  Theodore J. Markow, Judge Designate

            Thomas W. McCandlish (Laura G. Aaron; Mary
            Jane Hall; Mezzullo & McCandlish, on
            briefs), for appellant.

            Carol S. Nance, Assistant Attorney General
            (Mark L. Earley, Attorney General; Ashley L.
            Taylor, Jr., Deputy Attorney General;
            Jane D. Hickey, Senior Assistant Attorney
            General, on brief), for appellee State
            Health Commissioner.

            No brief or argument for appellee Eastern
            Virginia Health Systems Agency, Inc.


     Sentara Norfolk General Hospital (Sentara) appeals from a

decision of the Circuit Court of the City of Norfolk that

affirmed a ruling of the State Health Commissioner

(Commissioner).  The Commissioner denied Sentara a Certificate

of Public Need (COPN) to initiate a liver transplant service at

its hospital in Norfolk, Virginia.  Sentara contends the

Commissioner committed reversible error when he denied Sentara's

application, despite the fact that the application satisfied all

the existing criteria for issuing a COPN. Sentara also argues that the Commissioner's decision was based upon evidence not contained in the record and upon a material mistake of fact. We agree and reverse the trial court.

I.

On July 31, 1996, Sentara filed an application for a COPN seeking authorization to perform liver transplants. Following a public hearing, the Eastern Virginia Health Systems Agency Board voted to recommend approval of the COPN. On February 28, 1997, however, the Department of Health's Division of Certificate of Public Need (DCOPN) recommended that the application be denied. The matter was then referred to an adjudication officer.

Following an informal hearing, the adjudication officer issued a report recommending that the COPN be approved. The adjudication officer concluded that Sentara's plan satisfied all the applicable statutory factors, including all applicable factors listed in the State Medical Facilities Plan (SMFP).[1] With regard to the SMFP's minimum requirement that a facility perform twelve transplants per year, he found that Sentara would perform six transplants in the first year of its program, twelve in the second year, and fifteen in the third year. The adjudication officer further found that "it may be anticipated"

---

[1]The version of the SMFP in effect at the time this petition was filed was adopted in 1992.

-

that Sentara eventually would be able to substantially exceed the regulatory minimum.

The evidence before the adjudication officer proved that in 1996, facilities able to perform liver transplants nationwide averaged thirty-six such procedures for the year.  Medical College of Virginia Hospital (MCVH) performed sixty-six liver transplants in 1996, the University of Virginia Hospital (UVAH) performed thirty-seven, and Fairfax Hospital performed fifty-three.  From 1992 through 1995, MCVH performed, respectively, thirty-one, thirty-seven, thirty-three, and thirty-nine liver transplants.

In 1994, eighteen residents of Sentara's primary service area received liver transplants.  This figure rose to twenty-one in 1995, and twenty-eight in 1996.[2]  The adjudication officer noted that forty to fifty percent of liver transplant patients at MCVH, and ten to twenty percent of liver transplant patients at UVAH originated from Sentara's potential service area.[3]

_____

[2]Dr. Michael Ryan testified that, of the twenty-eight persons from Sentara's potential service area who received liver transplants in 1996, MCVH performed twenty-four of those procedures.

[3]In another section of his report, the adjudication officer indicated that "[b]ased upon the analysis performed by the staff of DCOPN, [Sentara] service area residents make up about 30% of the utilization of the MCVH liver transplant program."  It is not clear from the record how these apparently inconsistent figures were calculated.  Based on Dr. Ryan's testimony, 36% of MCVH's transplant patients in 1996 came from Sentara's potential service area.

-

Nevertheless, he found that "the development of a liver transplant service at [Sentara] should only marginally alter the volume of liver transplants at MCVH, which is located in Health Planning Region (HPR) IV,[4] where a fully accredited fellowship training program for liver transplant surgeons exists." The adjudication officer explained that "the number of liver transplant patients from eastern Virginia appears to be increasing and, coupled with the projected slow start-up of the [Sentara] liver transplant service, no significant impact on liver transplant volume at the MCVH transplant center should occur in the first three years."

The Commissioner rejected the adjudication officer's recommendation and denied the COPN. Citing the average numbers of transplants performed in Virginia and nationwide in 1996, the Commissioner found that the SMFP minimum transplant requirement was too low and out of date. The Commissioner stated:

> I find that the provisions of the State Medical Facilities Plan as they relate to liver transplantation services are inaccurate, outdated, inadequate or otherwise inapplicable. Because they fail to reflect current standards, they should not be applied here, and I will direct that procedures be initiated to make appropriate amendments to such plan.

---

[4]The Commonwealth is divided into five Health Planning Regions (HPRs). MCVH is in region IV, while Sentara is in region V.

-

The Commissioner further found that "[i]ndications in the healthcare system are that the numbers of available organs may be reaching a plateau." This fact would limit the number of procedures that could be performed each year, regardless of whether the demand for liver transplants continued to grow. The Commissioner expressed concern that adding a liver transplant program at Sentara could adversely affect other Virginia facilities, especially MCVH and UVAH. He cited the adjudication officer's finding that forty to fifty percent of MCVH's liver transplant volume, and ten to twenty percent of UVAH's volume came from Sentara's potential service area. The Commissioner also expressed concern that spreading patients over four programs would significantly reduce the average number of liver transplants performed at each facility and that this overall per-facility decrease in volume could adversely affect the quality of care each facility provided.

The Commissioner continued that, even if Sentara's transplant numbers remained around fifteen per year, the SMFP

> contemplates that "successful transplantation programs are expected to perform substantially larger numbers of transplants annually. Performance of minimum transplantation volumes does not necessarily indicate a need for additional transplantation capacity or programs." Thus, even the unamended State Medical Facilities Plan governing liver transplantation services is not binding as to minimum acceptable volumes.

-

The Commissioner suggested that, by performing twelve to fifteen transplants per year, Sentara might not be able to develop and maintain "essential technical expertise."

Finally, the Commissioner found that granting the COPN to Sentara could, by lowering the number of transplants performed at MCVH, adversely impact MCVH's liver transplant fellowship program. In what he now concedes was a mistake of fact, the Commissioner noted that the American College of Surgeons requires training facilities to perform forty-five transplants per year. The standard had been recently amended, however, by requiring transplant fellows to perform forty-five liver transplants during the course of their two-year fellowships.

Sentara appealed the Commissioner's ruling to the trial court, which affirmed the Commissioner. The trial court found that the Commissioner did not abuse his discretion in rejecting the COPN, even though Sentara met all the minimum SMFP requirements. The court held that the Commissioner's reliance on extra-record evidence and "institutional knowledge" regarding organ donation rates did not result in substantial prejudice to Sentara. Similarly, the trial court also ruled that the Commissioner's mistake of fact regarding fellowship requirements constituted harmless error.

## II.

"Under Code § 32.1-24, the provisions of the Virginia Administrative Process Act . . . govern the procedures for

-

rendering case decisions and issuing orders and regulations by the Commissioner." Johnston-Willis, Ltd. v. Kenley, 6 Va. App. 231, 241, 369 S.E.2d 1, 6 (1988). "[T]he party complaining of an agency action has the burden of demonstrating an error of law subject to review." Hilliards v. Jackson, 28 Va. App. 475, 479, 506 S.E.2d 547, 549 (1998).

> Errors of law fall into two categories:
> first, whether the agency decisionmaker
> acted within the scope of his authority, and
> second, whether the decision itself was
> supported by the evidence. Where the agency
> has the statutory authorization to make the
> kind of decision it did and it did so within
> the statutory limits of its discretion and
> with the intent of the statute in mind, it
> has not committed an error of law in the
> first category.

Johnston-Willis, 6 Va. App. at 242, 369 S.E.2d at 7.

The level of deference accorded to an agency decision depends upon the nature of the legal question involved. "[W]here the question involves an interpretation which is within the specialized competence of the agency and the agency has been entrusted with wide discretion by the General Assembly, the agency's decision is entitled to special weight in the courts." Id. at 244, 369 S.E.2d at 8. Such deference is not in order, however, where the issue is one in which the courts have a special competence. See id. at 243-44, 369 S.E.2d at 7-8. "Thus, where the legal issues require a determination by the reviewing court whether an agency has, for example, accorded constitutional rights, failed to comply with statutory

-

authority, or failed to observe required procedures, less deference is required . . . ."  Id. at 243, 369 S.E.2d at 7-8.

                              III.

     Code § 32.1-102.3 provides that no hospital can commence any project without first obtaining a COPN from the Commissioner.

> Any decision to issue or approve the issuance of a certificate shall be consistent with the most recent applicable provisions of the State Medical Facilities Plan; however, if the Commissioner finds, upon presentation of appropriate evidence, that the provisions of such plan are inaccurate, outdated, inadequate or otherwise inapplicable, the Commissioner, consistent with such finding, may issue or approve the issuance of a certificate and shall initiate procedures to make appropriate amendments to such plan.

Code § 32.1-102.3(A) (emphasis added).

     Sentara contends that while Code § 32.1-102.3(A) allows the Commissioner to grant a COPN if there is a need therefor and the Commissioner finds that the SMFP is outdated, the Commissioner cannot deny a COPN based on a finding that the existing SMFP is outdated.  The Commissioner asserts that the statutory language "may issue or approve the issuance" of a COPN means that he may grant or deny a certificate on the ground that the SMFP is inaccurate or outdated.  We agree with Sentara.

     "[A]dministrative agencies, in the exercise of their powers, may validly act only within the authority conferred upon them by statutes vesting power in them."  Sydnor Pump & Well Co.

                              -

<u>v. Taylor</u>, 201 Va. 311, 316, 110 S.E.2d 525, 529 (1959).  And appellate courts "'must construe the law as it is written.  An erroneous construction by those charged with its administration cannot be permitted to overrule the clear mandates of a statute.'"  <u>Richmond v. County of Henrico</u>, 185 Va. 176, 189, 37 S.E.2d 873, 879 (1946) (citation omitted), <u>modified on other grounds</u>, 185 Va. 859, 41 S.E.2d 35 (1947).

"A primary rule of statutory construction is that courts must look first to the language of the statute.  If a statute is clear and unambiguous, a court will give the statute its plain meaning."  <u>Loudoun County Dep't of Social Servs. v. Etzold</u>, 245 Va. 80, 85, 425 S.E.2d 800, 802 (1993).  "Generally, the words and phrases used in a statute should be given their ordinary and usually accepted meaning unless a different intention is fairly manifest."  <u>Woolfolk v. Commonwealth</u>, 18 Va. App. 840, 847, 447 S.E.2d 530, 534 (1994).  "[W]e must assume that 'the legislature chose, with care, the words it used when it enacted the relevant statute, and we are bound by those words as we interpret the statute.'"  <u>City of Virginia Beach v. ESG Enters., Inc.</u>, 243 Va. 149, 153, 413 S.E.2d 642, 644 (1992) (citation omitted).

Because this is an issue of statutory construction, we owe less deference to the Commissioner's interpretation.  We interpret Code § 32.1-102.3(A) as providing that the Commissioner may, but is not required to, issue a COPN where a public need has been demonstrated for a project, but where the

-

petition does not satisfy an outdated or inaccurate SMFP.  We reject the Commissioner's assertion, however, that the General Assembly intended to grant the Commissioner the authority to deny a COPN on the ground that the SMFP is outdated or inaccurate.  The plain language of the statute provides that the Commissioner "may issue or approve" a petition that does not comply with an outdated or inaccurate SMFP.  (Emphasis added.) It does not provide that he may deny or disapprove a petition on this basis.  Accordingly, to the extent the Commissioner denied this application on the ground that the SMFP standards were outdated, inaccurate, inadequate or otherwise inapplicable, he exceeded his statutory authority.

IV.

Sentara further contends the circuit court erred in holding that the Commissioner's reliance on extra-record evidence of liver donation rates did not result in substantial prejudice to Sentara and that the court erred when it found that the Commissioner's mistake of fact regarding fellowship requirements was not material.

The adjudication officer did not make a finding regarding organ donation rates, although the record contains evidence concerning those rates.  In a September 17, 1996 letter to the executive director of the Eastern Virginia Health Systems Agency, MCVH's Dr. Marc Posner wrote that in the three years through 1995, the number of liver transplants performed in

-

Virginia had reached a plateau, "indicating the driving force is now only the numbers of available donor organs."  At the May 20, 1997 hearing conducted by the adjudication officer, Dr. John Colonna testified that "[w]e have all seen, at least in D.C., a great slowing on our organ donation since the recent 60 minute thing on non heartbeat donors."  (Emphasis added.)  There was also evidence that MCVH has to "import" livers from out of state and that liver transplants generally have always been limited by the supply of donated organs.

Also contained in the record is a chart titled "MCV Liver Transplant Program--Liver Donations in Virginia."  The chart reflects that liver donations in Virginia increased every year from 1991 through 1994, but declined in 1995.  Despite this decline, however, the number of liver transplants performed in Virginia in 1995 was fourteen percent higher than the number performed in 1994.  And the 156 liver transplants performed in Virginia in 1996 was twenty-one percent higher than the 1994 figure.  Statistics in the record reflect that the number of liver transplants in Virginia grew from twenty-two in 1988 to 156 in 1996.

We addressed the issue of extra-record evidence in Johnston-Willis:  "Members of an administrative body cannot decide issues on personal knowledge, but must rely upon the evidence produced before them."  Id. at 258, 369 S.E.2d at 16.  Accordingly, as a preliminary matter, we must determine whether

-

evidence in the record proved that organ donation rates had reached a plateau, or whether the Commissioner relied on extra-record evidence in reaching this conclusion.

"The standard of review of an agency's factual findings on appeal to a circuit court is limited to determining whether substantial evidence in the agency record supports its decision." Avante at Lynchburg, Inc. v. Teefey, 28 Va. App. 156, 160, 502 S.E.2d 708, 710 (1998) (emphasis added). Under the "substantial evidence" standard, an agency's factual findings should be rejected "'only if, considering the record as a whole, a reasonable mind would necessarily come to a different conclusion.'" Tidewater Psychiatric Inst. v. Buttery, 8 Va. App. 380, 386, 382 S.E.2d 288, 291 (1989) (quoting Virginia Real Estate Comm'n v. Bias, 226 Va. 264, 269, 308 S.E.2d 123, 125 (1983)). "The phrase 'substantial evidence' refers to 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Bias, 226 Va. at 269, 308 S.E.2d at 125 (citation omitted). Additionally, "the court must review the facts in the light most favorable to sustaining the [Commissioner's] action and 'take due account of the presumption of official regularity, the experience and specialized competence of the [Commissioner], and the purposes of the basic law under which the [Commissioner] has acted.'" Bio-Medical Applications of Arlington, Inc. v. Kenley, 4 Va. App. 414, 427, 358 S.E.2d 722, 729 (1987) (quoting Code § 9-6.14:17).

-

Having reviewed the record, including those specific portions cited by the Commissioner, we find as a matter of law that the evidence contained in the record is insufficient to support the Commissioner's finding that organ donation rates have reached a plateau.[5] At best, the evidence in the record on trends in organ donation rates is inconclusive. We cannot conclude, for example, that a one year decline in organ donation rates reflects a trend. This faulty logic is demonstrated by the evidence on liver transplant rates. The number of liver transplants performed in Virginia declined in 1992 and 1994, but increased in 1993 and in 1995 and 1996. We conclude, therefore, that the Commissioner relied on extra-record evidence in making his factual finding on organ donation rates.

The Commissioner asserts that information on organ donation rates constituted part of his "institutional knowledge," upon which he could rely in making such a determination. While we do not reach the issue of whether the Commissioner can ever rely on institutional knowledge in making a decision on a COPN application, we hold that statistical evidence such as trends in organ donation rates does not constitute institutional knowledge. Similarly, the Commissioner has failed to establish

---

[5]The Joint Appendix contains a photocopy of a 1998 newspaper article reporting that "the number of cadaver donors has remained at 5,400 a year for three years." In addition to the fact that this figure does not specifically address the level of liver donations, the article was published _after_ the Commissioner rendered his decision.

-

that this empirical evidence could be classified as a "public statistic."  Cf. Johnston-Willis, 6 Va. App. at 259, 369 S.E.2d at 16 (finding that data regarding birth and fertility rates received from the Virginia Center for Health Statistics constituted "public statistics" upon which the Commissioner could rely even though the statistics were not part of the record).

Having concluded that the Commissioner improperly relied upon extra-record evidence, we must determine whether this reliance constituted reversible error.

> [T]he rules of evidence are relaxed in an administrative proceeding and the findings will not be reversed solely because the Commissioner considered evidence not in the record.  "[T]he mere fact that the [agency] has looked beyond the record does not invalidate its action unless substantial prejudice is shown to result."  "No reversible error will be found . . . unless there is a clear showing of prejudice arising from the admission of such evidence, or unless it is plain that the agency's conclusions were determined by the improper evidence, and that a contrary result would have been reached in its absence."

Johnston-Willis, 6 Va. App. at 258, 369 S.E.2d at 16 (citations omitted).

If the record contains sufficient evidence to sustain the Commissioner's ruling, then Sentara's claim that it was prejudiced by the Commissioner's consideration of extra-record evidence regarding organ donation rates must fail.  In reviewing the record, we owe "deference to [the agency's] findings of

fact, [and] where substantial evidence in the record exists to support the agency's conclusions, we may not substitute our own judgment for that of the agency." Smith v. Dept. of Mines, Minerals & Energy, 28 Va. App. 677, 687, 508 S.E.2d 342, 347 (1998). Nevertheless, "the reviewing courts should not abdicate their judicial function and merely rubber-stamp an agency determination." Johnston-Willis, 6 Va. App. at 243, 369 S.E.2d at 7-8. We will overturn the Commissioner's decision if it is arbitrary and capricious. See Tidewater Psychiatric Inst., 8 Va. App. at 386, 382 S.E.2d at 291.

The evidence proved, and the Commissioner did not dispute, that Sentara's petition satisfied all the pertinent statutory factors and the minimum requirements in the SMFP. See Code § 32.1-102.3(B). The Commissioner expressed two concerns: 1) the negative effect Sentara's program might have on the liver transplant programs at MCVH and UVAH, and 2) whether Sentara would be performing a sufficient number of transplants each year to maintain the requisite level of surgical expertise.

The Commissioner's concern that Sentara's program would adversely affect MCVH was speculative at best. By its third year, Sentara would be performing only fifteen transplants per year. Even if we assumed that all these patients would have been treated by MCVH, the number of transplants performed at

-

MCVH would be fifty-one.[6]  This number is still significantly higher than the national average and is substantially more than MCVH performed in the years before 1996.  Moreover, there is no evidence that this reduction would adversely affect MCVH's fellowship program.

The Commissioner found that an additional facility performing liver transplants would place the Commonwealth's programs below the national average of thirty-six transplants per center per year.  This conclusion is erroneous.  If liver transplants in Virginia remained static at the 1996 level of 156 per year, adding a fourth facility would drop Virginia's per-facility average to thirty-nine, three above the national average.  Accordingly, the Commissioner's finding that Sentara's program would have an adverse affect on the quality of other transplant programs in Virginia is not supported by the evidence.

There is likewise no evidence that Sentara would not be performing enough transplants each year to maintain a satisfactory level of technical expertise.  Sentara projected that by the third year of its program, it would be performing fifteen transplants per year, which is twenty-five percent above the SMFP minimum.  Other than the SMFP's minimum requirements, there is no evidence in the record on the minimum number of

---

[6]This conclusion assumes that the number of liver transplants performed at MCVH remains at sixty-six per year.

-

transplants a facility must perform each year to maintain its expertise in the field. The Commissioner's finding that Sentara would not be performing a sufficient number of transplants to maintain technical expertise is also not supported by the evidence.

When Sentara's petition is viewed in conjunction with the current SMFP and the other evidence in the record, it is apparent that the Commissioner's decision denying the COPN was arbitrary and capricious. Since the evidence contained in the record was insufficient to support the Commissioner's denial of the petition, we must find that Sentara was substantially prejudiced by the Commissioner's consideration of extra-record evidence regarding organ donation rates. Accordingly, the Commissioner's reliance on this evidence constituted reversible error.

Likewise, we cannot say the Commissioner's mistake of fact regarding fellowship requirements was harmless error. In the absence of substantial credible evidence supporting the Commissioner's decision to deny the COPN, we must assume that Sentara was also prejudiced by this mistake of fact.

For the reasons stated above, we hold that the Commissioner exceeded his statutory authority when he denied Sentara's petition for a COPN on the ground that the SMFP was out of date. Based on our review of the record, we hold that the Commissioner's denial of the petition was arbitrary and

-

capricious.  And, in the absence of substantial evidence otherwise supporting the Commissioner's decision, his reliance on extra-record evidence and his mistake of fact regarding fellowship program certification requirements constituted reversible error.  Accordingly, the judgment of the trial court is reversed and the case is remanded to the trial court for remand to the Commissioner, who is instructed to issue the COPN to Sentara and to conduct any further proceedings consistent with this decision.  Sentara's request for costs and fees is denied.

<u>Reversed and remanded.</u>