## Richmond
JOHNSTON-WILLIS, LIMITED

v.

JAMES B. KENLEY, M.D., etc.

No. 1288-86-2

Decided May 3, 1988

COUNSEL

Robert T. Adams (Rosewell Paige, III, Julia Krebs-Markrich, McGuire, Woods, Battle and Boothe, on brief), for appellant.

John A. Rupp, Senior Assistant Attorney General (Mary Sue Terry, Attorney General; Carol S. Nance, Assistant Attorney General, on brief), for appellee.

OPINION

**KOONTZ, C.J.**—Johnston-Willis, Limited appeals from a final judgment of the circuit court upholding the State Health Commissioner's (Commissioner) denial of its application for a certificate of public need (CON). Johnston-Willis had sought a CON to add obstetrical beds and to reorganize its outpatient surgery program. The Commissioner denied the CON in its entirety. Johnston-Willis appealed the Commissioner's decision to the Circuit Court of Chesterfield County. That court reversed the Commissioner's decision denying Johnston-Willis a CON to reorganize

and consolidate its outpatient surgery program; however, the court affirmed the Commissioner's decision denying Johnston-Willis a CON to add obstetrical services. This appeal followed.

Johnston-Willis raises numerous issues on appeal which, for purposes of this opinion, we summarize as follows:

1. Whether the trial court erred in holding that the Commissioner may rely upon the State Medical Facilities Plan to deny Johnston-Willis' request for a certificate of need in this case.

2. Whether the trial court erred in holding that the Commissioner properly considered state and federal regulations which establish minimum occupancy standards.

3. Whether the trial court erred in holding that the Commissioner may rely upon the State Medical Facilities Plan and the statistical methodologies contained therein, which Johnston-Willis contends are inaccurate, inadequate or outdated.

4. Whether the trial court erred in holding that the Commissioner, consistent with the notice requirements of Code § 9-6.14:11, properly considered extra-record data.

5. Regardless of the projections of surplus beds under the provisions of the State Medical Facilities Plan, whether Johnston-Willis is entitled to a certificate of need under the provisions of the State Health Plan.

6. Whether the trial court erred in holding that the Commissioner's decision to deny a certificate of need in this case was based upon substantial evidence.

Finding no reversible error, we affirm the decision of the circuit court denying a CON to Johnston-Willis for the construction of obstetrical services.

## I. Factual and Procedural Background

Johnston-Willis Hospital is a 292 bed community hospital located south of the James River in Chesterfield County, Virginia. On June 14, 1985, Johnston-Willis filed an application for a CON

with the Commissioner, pursuant to procedures established by Code § 32.1-102.6. Johnston-Willis proposed to establish new obstetrical services and consolidate and reorganize its outpatient surgery program. The construction entailed an addition of approximately 35,000 square feet, of which approximately 17,500 square feet was to be dedicated to the obstetrical unit. The proposal provided for the removal from service of 20 surgical/medical beds which were to be converted into sixteen private labor, delivery, recovery rooms; four private rooms for gynecological surgery patients; a nursery featuring fourteen full-term bassinets and four continuing-intermediate care bassinets; one delivery room with caesarean section capabilities; a physicians' lounge; and support space including a nurse's station, clean utility, soiled utility, examination room, nurse's locker area and classroom space. The obstetrical suite was to cost an estimated $4.7 million.

Johnston-Willis asserted that the establishment of new obstetrical services and the addition of twenty obstetrical beds were justified because the proposal would substantially improve access to obstetric and new born services for individuals south and west of the hospital, provide an innovative cost efficient service not currently available in the Richmond market, and provide sufficient bed capacity to meet the projected 1989 demand for obstetrical services in Planning District 15.[1]

Johnston-Willis' proposal and application were reviewed by the Central Virginia Health Systems Agency (CVHSA), a regional planning body consisting of health care providers and consumers, as required under Code § 32.1-102.6(B). Following a public hearing on August 26, 1985, the CVHSA staff concluded that Johnston-Willis failed to demonstrate a need for twenty additional beds. Citing the State Medical Facilities Plan (SMFP), the staff stated that 207 obstetrical beds will be needed in Planning District 15 by 1989, while there are currently 217 obstetrical beds in Planning District 15, resulting in a surplus of ten beds. Further, the staff noted that OB bed utilization was generally low and had been declining in recent years in Planning District 15. The staff

[1] The Commonwealth of Virginia is divided into seven health service areas (HSA) which are essentially regional planning areas. Each HSA is further divided into planning districts. Johnston-Willis is situated in HSA IV, Planning District 15. Planning District 15 consists of the City of Richmond and the Counties of Charles City, Chesterfield, Goochland, Hanover, Henrico, New Kent and Powhatan.

recommended that Johnston-Willis' application for a CON be denied because Johnston-Willis failed to demonstrate that sufficient need existed within the patient population for the services, that existing obstetrical beds in Planning District 15 are presently under-utilized and there is a projected excess of OB beds, and that other facilities providing obstetrical services in Planning District 15 would be adversely affected. Nevertheless, the CVHSA Board of Directors recommended that the Commissioner approve Johnston-Willis' proposal because the proposal would purportedly correct maldistribution of obstetrical services in Planning District 15, and improve access to obstetrical services in a high growth area.

The Division of Resources Development staff of the Department of Health contemporaneously prepared an extensive report analyzing Johnston-Willis' application. The staff recommended that the Commissioner deny Johnston-Willis' application because Johnston-Willis failed to demonstrate additional OB beds were necessary to meet current or future needs; that Johnston-Willis' close proximity to Chippenham Hospital, some six miles away, whose OB utilization was 63.7 percent in 1984, made establishment of OB services at Johnston-Willis unnecessary and costly; utilization of existing obstetrical services in Planning District 15 was low; and that the project was not consistent with the State Health Plan or the 1984 State Medical Facilities Plan.

On November 21, 1985, the Commissioner's hearing officer conducted an informal fact-finding conference, pursuant to Code § 9-6.14:11, to determine whether Johnston-Willis' proposal was consistent with the State Health Plan and State Medical Facilities Plan. During the conference, Johnston-Willis presented numerous witnesses, including area practicing physicians, a statistical expert, an architect, and the hospital administrator. Johnston-Willis entered numerous exhibits into the record, including evidence of traffic patterns, density, and congestion in Chesterfield County. Johnston-Willis also presented a report responding to the Commissioner's staff's analysis of its application for a CON.

On January 16, 1986, the Commissioner notified Johnston-Willis that its application for a CON had been denied, based upon the unfavorable recommendation of the hearing officer, Marilyn H. West. Among the more relevant findings of fact contained in the report prepared by the hearing officer were the following:

1. There are five hospitals in Planning District 15 that now provide obstetrical services. These hospitals according to the size and occupancy of their OB units in 1983 and 1984 follow:

|  |  | Occupancy | |
|---|---|---|---|
|  |  | 1984 | 1983 |
| Chippenham Hospital | 32 beds | 63.6 | 97.7 |
| Henrico Doctor's Hospital | 34 beds | 94.9 | 102.1 |
| Medical College of Virginia | 74 beds | 79.4 | 66.9 |
| Richmond Memorial Hospital | 42 beds | 28.1* | 34.2 |
| St. Mary's Hospital | 35 beds | 58.7 | 60.5 |

*Estimated

2. While studies conducted by the Chesterfield County Planning Department and Highway Department substantiate the impact that population and commercial growth in Chesterfield County has had on increasing the traffic congestion on Midlothian Turnpike and Route 147, the record also contains the following evidence:

(a) While 65.4% of future growth in Chesterfield County will be within its Midlothian and Clover Hill magisterial districts, the population of these areas represents less than 50% of the total area to be served by Johnston-Willis.

(b) The traffic flows from south and west of the hospital in a fairly uninterrupted fashion owing to the relative rural nature of these areas.

(c) There are alternative routes available which may be used by Chesterfield County residents to obtain obstetrical services.

(d) Chesterfield County is ranked third among Virginia localities in terms of traffic congestion by the Highway Department. Such high ranking increases a likelihood that approaches for relieving congestion will be investigated and implemented. The Powhite extension is a result of such study.

(e) The record does not contain evidence to demonstrate that the residents of the areas to be served by Johnston-Willis Hospital have experienced significant delays in obtaining

needed services.

(f) The record shows that of the Chesterfield County deliveries to Planning District 15 hospitals in 1984, 54.1 percent [were] in hospitals that were located at a greater distance from Johnston-Willis hospital than Chippenham Hospital. When this same thinking is applied to other residents of the primary service area of Johnston-Willis Hospital, 62.7 percent of Powhatan residents, 59.1 percent of Amelia residents and 69.8 percent of Nottoway residents delivered at Planning District 15 hospitals other than Chippenham Hospital. Chippenham Hospital's occupancy in 1984 was 63.6 percent. It is also noted that the number of deliveries at Chippenham Hospital declined from 1,904 in 1983 to 1,777 in 1984.

(g) With the exception of Nottoway County, more than 88 percent of the deliveries from the areas to be served by Johnston-Willis Hospital were accommodated at Planning District 15 hospitals. Chippenham Hospital and St. Mary's Hospital both reported occupancies below the 75 percent occupancy recommended by the State Health Plan.

3. The 1984 Virginia State Medical Facilities Plan shows an excess of ten OB beds for Planning District 15 by 1989. A draft update indicates that there will be an excess of fourteen OB beds in Planning District 15 by 1990.

4. The State Health Plan refers to 75 percent as being desirable occupancy standard for obstetrical units.

5. While the construction of the Johnston-Willis Hospital project involves no new beds, it involves substantial new construction and a substantial capital expenditure. The record also shows that the proposed project will negatively impact several existing OB programs where the utilization is declining.

The hearing officer stated that the factors most germane to the evaluation and recommendation of denial to the Johnston-Willis Hospital proposal include: (1) the inconsistency of the project with the State Health Plan and the State Medical Facilities Plan; (2) the accessibility of existing OB services to residents to be served by the proposed project; and (3) the expected negative impact of the proposed project on existing OB services in Planning District 15. The report also addressed those factors enumerated in Code

§ 32.1-102.3(B).

The report concluded that the project should not be approved because:

1. The need to add OB services was not demonstrated given the unused capacity existing in Planning District 15 hospitals that could accommodate any unmet need for these services by the residents that Johnston-Willis intends to serve;

2. The proposed project is inconsistent with the OB bed need projection set forth in the State Medical Facilities Plan. The current plan shows a surplus of beds. The draft plan also shows a surplus of OB beds in Planning District 15. The proposed project is also generally inconsistent with the policies of the State Health Plan which discourages the development of new services when health systems costs will be negatively impacted and utilization of existing services will be lower;

3. The proposed project will not significantly improve the accessibility of obstetrical services for Planning District 14 and Planning District 15 residents to justify the expenditure;

4. The proposal will have a negative impact on the generally lower overall occupancy of existing obstetrical units in Planning District 15. Three of the five units have an occupancy rate that is below the recommended 75 percent occupancy standard in the State Health Plan. The overall occupancy of the OB units in Planning District 15 was 66 percent in 1984, representing a four percent decrease in occupancy from 1983;

5. Johnston-Willis has not demonstrated that residents of this proposed service area are not receiving timely and quality services in existing hospitals with OB units in Planning District 15 and Planning District 14.

Johnston-Willis appealed the Commissioner's decision and the Chief Justice of the Supreme Court of Virginia appointed a circuit court judge to hear the appeal pursuant to Code § 32.1-102.9. The circuit court held as follows:

[T]he appellant has not carried [the] burden as to its application for a certificate of public need . . . . The Court finds that the Commissioner has the right to and properly did rely upon the State Medical Facilities Plan and Virginia State Health Plan. The Commissioner was entitled to have the Court take due account of the presumption of official regularity and his experience and specialized competence. In this regard, the Commissioner properly concluded that a minimum obstetrical occupancy standard of seventy-five percent was applicable. The Court finds that the Commissioner properly considered the accuracy and adequacy of State Medical Facilities Plan and the Commissioner properly relied upon the planning district analysis in determining need projects [sic]. The Commissioner also had the right to consider travel time data as well as information concerning obstetrical bed utilization at Southside Community Hospital in Prince Edward County, Virginia. [T]he Commissioner's decision in denying the hospital's application is based on substantial evidence.

## II. Standard of Review

Under Code § 32.1-24, the provisions of the Virginia Administrative Process Act (VAPA), Code §§ 9-6.14:1 to 14:25, govern the procedures for rendering case decisions and issuing orders and regulations by the Commissioner. The burden is upon the party complaining of the agency action to demonstrate an error of law subject to review. Code § 9-6.14:17; *Roanoke Memorial Hospitals v. Kenley*, 3 Va. App. 599, 603, 352 S.E.2d 525, 527 (1987). The issues of law subject to review include:

1. Agency failure to accord constitutional right, power, privilege, or immunity;

2. Agency failure to comply with statutory authority, jurisdiction limitations, or right as provided in the basic laws . . . .;

3. Agency failure to observe required procedures where the failure is not mere harmless error; and

4. Agency failure to have substantial evidential support for findings of fact.

*See* Code § 9-6.14:17.

It has become the common practice, as the Attorney General has done in this case, to catalogue and define the limited judicial review of agency decisions pursuant to Code § 9-6.14:17 in the following manner:

1. Whether the agency acted in accordance with law;

2. Whether the agency made a procedural error which was not harmless error; and

3. Whether the agency had sufficient evidential support for its findings of fact.

Errors of law fall into two categories: first, whether the agency decisionmaker acted within the scope of his authority, and second, whether the decision itself was supported by the evidence. Where the agency has the statutory authorization to make the kind of decision it did and it did so within the statutory limits of its discretion and with the intent of the statute in mind, it has not committed an error of law in the first category. The second category of error is limited to a determination whether there is substantial evidence in the agency record to support the decision. *See State Board of Health v. Godfrey*, 223 Va. 423, 290 S.E.2d 875 (1982).

■ The sole determination as to factual issues is whether substantial evidence exists in the agency record to support the agency's decision. The reviewing court may reject the agency's findings of fact only if, considering the record as a whole, a reasonable mind would necessarily come to a different conclusion. *Virginia Real Estate Commission v. Bias*, 226 Va. 264, 269, 308 S.E.2d 123, 125 (1983); *Roanoke Memorial Hospitals v. Kenley*, 3 Va. App. 599, 610, 352 S.E.2d 525, 531 (1987); *Kenley v. Waterway Estates, Ltd.*, 3 Va. App. 50, 56, 348 S.E.2d 31, 34 (1986). Code § 9-6.14:17 further provides that, in the context of factual issues, the reviewing court shall take due account of the presumption of official regularity, the experience and specialized competence of the agency, and the purposes of the basic law under which the agency has acted.

While we agree with these principles as stated, we believe it is also helpful to define the appropriate standard of review in terms of the degree of deference to be given to agency decisions. In determining that degree of deference many courts have made a distinction between whether an issue is legal or factual. Generally, factual issues are accorded greater deference in order to give stability and finality to the fact finding of the agency. Legal issues are accorded less deference. This dichotomy, however, is somewhat a fiction, is too simplistic, and involves the difficulty of drawing lines between legal and factual issues. That difficulty arises because many issues are more accurately described as mixed questions of law and fact. The legal/factual distinction is nevertheless instructive. *See, e.g., Hi-Craft Clothing Co. v. NLRB*, 660 F.2d 910, 912-15 (3d Cir. 1981).

In this context, Code § 9-6.14:17 clearly mandates that agency findings of fact are to be accorded great deference under the substantial evidence standard of review. However, when deciding whether an agency has followed proper procedures or complied with statutory authority (issues which Johnston-Willis raises in this appeal), an inquiry into whether there is substantial evidence in the record to support findings of fact of an agency is wholly inappropriate. Indeed, even though an agency's findings of fact may be supported by substantial evidence in the record, it may be subject to reversal because the agency failed to observe required procedures or to comply with statutory authority. *See, e.g., Atkinson v. Virginia Alcoholic Beverage Control Commission*, 1 Va. App. 172, 336 S.E.2d 527 (1985). Thus, where the legal issues require a determination by the reviewing court whether an agency has, for example, accorded constitutional rights, failed to comply with statutory authority, or failed to observe required procedures, less deference is required and the reviewing courts should not abdicate their judicial function and merely rubber-stamp an agency determination.

Thus, the degree of deference afforded an agency decision depends upon not only the nature of the issue, legal or factual, but also upon whether the issue falls within the area of "experience and specialized competence of the agency." Code § 9-6.14:17. "If the issue falls outside the area generally entrusted to the agency, and is one in which the courts have a special competence, i.e., the common law or constitutional law, there is little reason for the

judiciary to defer to an administrative interpretation." *Hi-Craft Clothing Co.*, 660 F.2d at 914-15 (citing *Piper v. Chris Craft Industries*, 430 U.S. 41 n.27 (1977)).

■ However, where the question involves an interpretation which is within the specialized competence of the agency and the agency has been entrusted with wide discretion by the General Assembly, the agency's decision is entitled to special weight in the courts.

> The rationale of the statutory scheme is that the [administrative agency] shall apply expert discretion to matters coming within its cognizance, and judicial interference is permissible only for relief against the arbitrary or capricious action that constitutes a clear abuse of the delegated discretion. The reviewing judicial authority may not exercise anew the jurisdiction of the administrative agency and merely substitute its own independent judgment for that of the body entrusted by the Legislature with the administrative function.

*Virginia Alcoholic Beverage Control Commission v. York Street Inn, Inc.*, 220 Va. 310, 315, 257 S.E.2d 851, 855 (1979)(quoting *Schmidt v. Board of Adjustment of the City of Newark*, 9 N.J. 405, 423, 88 A.2d 607, 615-16 (1952)).

As previously noted, Code § 9-6.14:17 provides that "the court shall take due account of the presumption of official regularity, the experience and specialized competence of the agency, and the purposes of the basic law under which the agency has acted." Whether the issue is one of law or fact or substantial evidence, we are directed to "take account of the role for which agencies are created and public policy as evidenced by the basic laws under which they operate." *Id.* (reviser's notes). The basic law under which the Commissioner acts and the purposes of the law are crucial to the determination of a reviewing court. *York Street Inn*, 220 Va. at 313, 257 S.E.2d at 853. We believe that the purposes of the basic law are central in our determination of Johnston-Willis' appeal. We, therefore, briefly review those purposes.

In response to inflationary increases in the cost of health care, maldistribution and unnecessary duplication of health care facilities, and ineffective organization of health resources, Congress enacted the National Health Care Planning Resource Development

Act of 1974, 42 U.S.C. §§ 300(k) to (n)(6)(1982). Designed to facilitate the development of a national health planning policy, the Act represented an attempt to establish, organize, and integrate national, state and local health care planning policy and administration. One of the means for restraining costs and preventing duplication of health services was the recommendation that states establish a certificate of need (CON) program. The CON is in essence a license granted by the Commonwealth. *See* Jones, *Administrative Procedure Survey*, 20 U. Rich. L. Rev. 690 (1986). The CON program applies, *inter alia*, to certain projects where large capital expenditures are involved, to the offering of new institutional services, and the acquisition of major medical equipment. 42 U.S.C. § 300(m)(2). *See* Code § 32.1-102.1 (defining "project"). A designated state agency is appointed to determine if there exists a public need for a given project. In Virginia the designated agency is the State Health Commissioner. Code § 32.1-102.3.

Under Virginia's Health Care Planning law, before certain projects may be commenced, a medical care facility shall first obtain a CON issued by the Commissioner. The Commissioner must determine that a public need for the project has been demonstrated and any decision to issue a CON must be consistent with the most recent applicable provisions of the State Health Plan (SHP) and the State Medical Facilities Plan (SMFP). If the Commissioner finds that the provisions of either plan are inaccurate, outdated, inadequate, or otherwise inapplicable, the Commissioner may nevertheless issue a CON and institute procedures to amend the plan appropriately. Code § 32.1-102.3(A). In determining whether a public need for a project has been demonstrated, the Commissioner shall consider twenty factors enumerated in Code § 32.1-102.3(B).

The SHP is a planning and development blueprint for the health activities of the Commonwealth and it "forms the foundation upon which the Department of Health and the Commissioner operate." *Roanoke Memorial Hospitals*, 3 Va. App. at 605, 352 S.E.2d at 528. The SMFP, which consists of two parts, is designed to meet the requirements of the CON program. Part I of the plan, the statistical update, presents the most recent statistics describing the current and future status of health care services and facilities in Virginia. Part II contains the projection methodologies. The nu-

merical projections in Part I are based on the methodologies in Part II. *See generally* 1984 State Medical Facilities Plan. For a CON to be consistent with the SHP and SMFP means "in harmony with . . . or in general agreement with." *Roanoke Memorial Hospitals*, 3 Va. App. at 606, 352 S.E.2d at 529.

In summary, the four issues of law subject to judicial review pursuant to Code § 9-6.14:17 present distinct issues that must be reviewed by the court utilizing separate standards. These separate standards of review dictate the degree of deference, if any, to be given to an agency's decision on appeal. Where the issue is whether there is substantial evidence to support findings of fact, great deference is to be accorded the agency decision. Where the issue falls outside the specialized competence of the agency, such as constitutional and statutory interpretation issues, little deference is required to be accorded the agency decision. Where, however, the issue concerns an agency decision based on the proper application of its expert discretion, the reviewing court will not substitute its own independent judgment for that of the agency but rather will reverse the agency decision only if that decision was arbitrary and capricious. Finally, in reviewing an agency decision, the courts are required to consider the experience and specialized competence of the agency and the purposes of the basic law under which the agency acted. In light of these standards of review, we now consider the specific issues raised by Johnston-Willis in this appeal.

### III.

Whether the trial court erred in holding that the Commissioner may rely upon the State Medical Facilities Plan to deny Johnston-Willis' request for a certificate of need in this case.

Johnston-Willis argues that the Commissioner may not rely upon the 1984 SMFP to deny its application because the statutory basis for the SMFP was repealed when the General Assembly transferred responsibility for the SMFP from the State Board of Health to the Virginia Statewide Health Coordinating Council (VSHCC) on July 1, 1984. When the General Assembly amended Code §§ 32.1-120 and 121, and added Code § 32.1-120.1, it simultaneously amended and reenacted Code §§ 32.1-120 and 121. The amendment authorized the VSHCC to "prepare, review an-

nually and revise as necessary" the SMFP. *See* 1984 Va. Acts ch. 424; Code § 32.1-120.

Johnston-Willis contends that the General Assembly failed to insert a savings clause in the 1984 act which transferred responsibility for preparing and revising the SMFP from the State Board of Health to the VSHCC, and when the VSHCC issued the 1984 SMFP, it did not follow the promulgation process as outlined in Article 2 of the Virginia Administration Process Act (VAPA). Therefore, because the SMFP was adopted and not promulgated, Johnston-Willis argues that the Commissioner's reliance on the SMFP constituted an error of law.

This issue which Johnston-Willis raises is a legal issue involving statutory interpretation which is within the specialized competence of the courts rather than of the administrative agency. Therefore on appeal, our review of this issue is not limited by the general notion of limited review and deference to an agency decision.

Although it is true that when the 1984 SMFP was adopted, it was not re-promulgated, and that the General Assembly failed to insert a savings clause when it amended and re-enacted Code §§ 32.1-120 and 121, for the following reasons we do not believe that the VSHCC was required to go through the lengthy public comment process required under the VAPA.

To accept Johnston-Willis' argument that the Commissioner may not properly rely upon the 1984 SMFP requires us to accept its initial legal premise that Code § 32.1-120 was repealed. "Repeal" is defined as:

> The abrogation or annulling of a previously existing law by the enactment of a subsequent statute which declares that the former law shall be revoked and abrogated . . . or which contains provisions so contrary to or irreconcilable with those of the earlier law that only one of the two statutes can stand in force.

Black's Law Dictionary 1167 (5th ed. 1979).

When the General Assembly "amended and re-enacted" Code § 32.1-120, it did not "declare that the former law should be revoked." Nor can we say that Code § 32.1-120, as amended, con-

tains provisions "so contrary or irreconcilable with" its earlier provisions that it cannot stand in force. Thus, we reject Johnston-Willis' argument that the statutory basis for the 1984 SMFP was repealed.

█ Code § 32.1-24 provides that the provisions of the VAPA shall govern the procedures for issuing regulations administered by the Commissioner, unless exempt under the VAPA. Although our review of the VAPA convinces us that the General Assembly clearly evinced its intent that regulations must be promulgated, it specifically provided that an agency may be exempted from the entire promulgation process under certain circumstances. *See* Code § 9-6.14:4.1 (formerly Code § 9-6.14:6)(agency may dispense, in whole or part, with prescribed procedures with respect to regulations which are required to conform to basic state laws when no agency discretion is involved). The reviser's notes to former Code § 9-6.14:6 shed light on the reasons for this common sense rule. "[I]t is particularly necessary that [agencies] have authority to omit [mandatory public] procedures in formal, trivial, technical, and other situations . . . . To force public procedure in such cases would make agency and legal processes appear supernumerary if not ridiculous." We believe that the 1984 SMFP, which contains numerical projections and statistical methodologies, is such a technical document or regulation which the General Assembly intended to be exempted from the entire promulgation process.

█ Even those regulations which are exempted from the promulgation process must go though an adoption procedure. *See* Code § 9-6.14:9 (Cum. Supp. 1984). Under this section, all regulations, including those which agencies may elect to dispense with public procedures, may be formally and finally adopted by the signed order of the agency so stating. However, no regulation, except an emergency regulation, shall be operative in less than thirty days after such adoption and the filing thereof in accordance with the Virginia Register Act (Code § 9-6.15 *et seq.*).

The record fails to reflect that the VSHCC complied with the Virginia Register Act when it adopted the 1984 SMFP, as required under Code § 9-6.14:9 (Cum. Supp. 1984). We recognize that the Virginia Register of Regulations did not come into existence until October 1, 1984, subsequent to the adoption of the 1984 SMFP. However, under Code § 9-6.18 (Cum. Supp. 1984),

the VSHCC was still required to file with the Virginia Registrar of Regulations a full text of any operative regulations. The 1984 SMFP was adopted on September 12, 1984, and a copy of the document was sent to the Virginia Register of Regulations on January 11, 1985. Thus, the 1984 SMFP was adopted without strict compliance with the Virginia Register Act. However, when the VSHCC sent the 1984 SMFP to the Virginia Registrar of Regulations on January 11, 1985, it complied with the Virginia Register Act, although at a later date. For the reasons that follow we believe that late compliance in the context of this case was harmless error.

Johnston-Willis does not argue that the 1983 SMFP or previous SMFPs were not properly promulgated when adopted. The 1984 SMFP, which consists of two parts, is designed to meet the requirements for the CON program. Part I, the statistical update, presents the most recent statistics describing the current and future status of health care services and facilities in Virginia. Part II contains projection methodologies and the numerical projections in Part I are based on the methodologies in Part II. *See* 1984 State Medical Facilities Plan, Introduction. When the VSHCC adopted the 1984 SMFP on September 19, 1984, it reviewed the 1983 SMFP pursuant to Code § 32.1-120, to provide the annual statistical update for Part I and left Part II, containing the projection methodologies, unchanged. The VSHCC was doing that which the General Assembly directed it to do: exercising authority over the 1984 SMFP, reviewing and revising the plan on an annual basis, and providing statistical updates to reflect the most recent data available. The VSHCC did not exercise any discretionary function or undertake any substantive changes to the SMFP, other than statistical updates in Part I.

In *Merry Heart Nursing and Convalescent Home, Inc. v. Dougherty*, 131 N.J. Super. 412, 330 A.2d 370 (1974), the court decided whether a change in a state health plan to reflect current statistical data is the kind of amendment requiring an agency to follow formal amendment procedures. In concluding that the agency was not so required, the court stated:

Statistics of this type are not static but change from time to time and must be brought up to date. We see no merit to the argument that whenever a statistical change occurs the plan

must be amended with the same formalities as that which attended its original promulgation. The Commissioner would be derelict in his duty if he did not take into consideration the latest available information in passing on an application for a certificate of need and would be acting contrary to the very intent and purpose of the statute.

*Id.* at 418, 330 A.2d at 373. We are persuaded by this reasoning.

In summary, we hold that the 1984 SMFP was not repealed when the General Assembly shifted responsibility for the plan from the State Board of Health to the VSHCC. Further, Part I of the 1984 SMFP is the type of regulation which is exempt from the formal, lengthy promulgation process. Finally, even though the VSHCC failed to comply with the Virginia Register Act when it adopted the 1984 SMFP, in the context of this case that error was harmless.

## IV.

Whether the trial court erred in holding that the Commissioner properly considered state and federal regulations which establish minimum occupancy standards.

In the report prepared by the hearing officer and adopted by the Commissioner, the Commissioner consistently stated that seventy-five percent is a desirable occupancy standard for obstetrical units. The Commissioner relied upon the 1984 State Health Plan, Vol. 1 at 480-524, as the source of this standard. This section of the SHP relied upon by the Commissioner explicitly applies to perinatal care services. Johnston-Willis contends that because it is a community hospital proposing to add obstetrical services, not a regional perinatal referral center serving high risk mothers, that the Commissioner erroneously applied the seventy-five percent occupancy standard because it was inapplicable to the hospital's proposal. Johnston-Willis further contends that the Commissioner improperly relied upon a seventy-five percent occupancy standard set forth in the national guidelines for health planning, 42 C.F.R. § 121.203 (1987),[2] to deny its application. Johnston-Willis asserts that the SHP specifically declined to adopt the national guide-

---

[2] Although 42 C.F.R. § 121.203 was in effect at all relevant times during this case, it was rescinded on March 30, 1987. *See* 52 Fed. Reg. 10094 (1987).

lines, and that the seventy-five percent standard set forth in 42 C.F.R. § 121.203, applies to hospitals treating complicated pregnancies, not hospitals such as Johnston-Willis which would be treating uncomplicated pregnancies. Therefore, Johnston-Willis argues that the Commissioner's adoption and application of the seventy-five percent standard constituted an error of law. The Commissioner concedes that the SHP does not explicitly specify the precise occupancy standard applicable to obstetrical beds. However, we believe the Commissioner's adoption of the seventy-five percent occupancy standard was proper and within his discretion. Furthermore, we cannot say the Commissioner's adoption of this standard was erroneous as a matter of law.

The 1984 SHP projected an average occupancy rate of 77.2 percent for obstetrical beds across the Commonwealth in 1984. 1984 State Health Plan, Vol. 1 at 431. This projection produced a finding of an excess of 292 beds. The SHP concluded, in light of the projected occupancy rate of 77.2 percent, that there would be an adequate or more than adequate supply of obstetrical beds through 1984 in all but a few areas of the state. *Id.* at 440. Planning District 15 is one of the planning districts which the SHP stipulates is experiencing a significant excess of beds supply relative to demand. *Id.* at 436. Implicit in these SHP findings is the conclusion that a 77.2 percent occupancy standard is acceptable, that an adequate or more than adequate number of OB beds exist, and that the 1984 statistical projection presented potential excess capacity.

Johnston-Willis maintains that it presented evidence to the Commissioner that demonstrated seventy percent is an ideal occupancy rate. However, our review of the record reflects that one of Johnston-Willis' expert witnesses, Dr. L. Daniel Crooks, testified that "an occupancy rate of 70 to 80 percent is probably an ideal occupancy rate . . . ." In light of this testimony, from one of Johnston-Willis' own witnesses, we believe the Commissioner could properly have concluded that seventy-five percent is an appropriate, even "ideal" occupancy rate.

We also believe that the Commissioner's reliance upon the national guidelines was not improper and did not constitute error. Johnston-Willis correctly points out that the SHP does not explicitly adopt or incorporate the national guidelines. It further relies on the following language from the SHP for its contention that

the Commissioner's reliance upon the national guidelines was improper and constituted error:

> It should be emphasized that a comparison with such guidelines [i.e., the National Guidelines] does not mean that the guideline or standard is accepted or in agreement with the state guidelines . . . .

1984 State Health Plan, Vol. 1 at 508.

While this language clearly establishes that the national guidelines are not accepted or necessarily in agreement with state guidelines, nothing in the language prevents the Commissioner from using these guidelines for their intended purpose — as guidelines.

Furthermore, Virginia's health care planning law was adopted in response to the National Health Planning Resource Development Act of 1974, 42 U.S.C. §§ 300(k) to (n)(6) (1982). Throughout the SHP there is a reference to and comparison with the national guidelines. For example the SHP provides:

> In passing the health planning legislation, the U.S. Congress determined that certain critical issues deserved priority consideration in the formulation of federal, state and regional health planning bills. Such priorities have been identified within Section 1502 P.L. 93-641, as amended by P.L. 97-70. It was not the intent of such national priority to serve as a substitute for state and regional priorities but that they provide policy guidance.

1984 State Health Plan, Vol. 1 at 13.

The National Health Plan and Resources Development Act did not promulgate mandatory regulations; however, it established optional programs which a state may implement if it is to receive federal funds. *See Greater St. Louis Health Systems Agencies v. Teasdale*, 506 F. Supp. 23, 27 (E.D. Mo. 1980). To accept Johnston-Willis' argument that the national guidelines may not be referred to or relied upon by the Commissioner would be to rule that the national guidelines are irrelevant. This we decline to do.

Furthermore, we disagree with Johnston-Willis' interpretation of the national guidelines, which provide in pertinent part:

§ 121.203 — Obstetrical Services

(a) Standard. (1) Obstetrical services should be planned on a regional basis with linkages among all obstetrical services and with neonatal services.

(2) Hospitals providing care for complicated obstetrical problems (Levels II and III) should have at least 1500 births annually.

(3) There should be an average annual occupancy rate of at least 75% in each unit with more than 1500 births per year.

* * *

[I]n order to promote more economical use of resources, the Department has established a 75% minimum occupancy rate in Level II and III facilities. The 75% figure was derived from an analysis of various occupancy rate figures in a number of source documents, whose recommendations range from 50% to over 80%. The Hill-Burton program recommended an occupancy level for obstetrical units of at least 75%. The Department anticipates that institutions operating at levels II and III will usually be able to exceed this level.

We agree with the Commissioner's interpretation of the national guidelines. Section 121.203(a)(3) of the guidelines provides there should be an average occupancy rate of at least seventy-five percent. The guidelines do not say that this rate applies exclusively to perinatal centers or centers handling complicated births. Furthermore, the guidelines plainly state that the Hill-Burton program recommends an occupancy level for obstetrical units of at least seventy-five percent, and that the occupancy rate figures and a number of source documents range from fifty percent to over eighty percent.

Because this issue is a legal issue which falls within the specialized competence of the Commissioner and his adoption of the occupancy standard involves the proper application of his expert discretion, we will reverse that decision only if it was arbitrary and capricious. "Taking 'due account of the presumption of official regularity, the experience and specialized competence of the [Commissioner], and the purposes of the basic law under which the [Commissioner] has acted,' we are of the opinion that the ruling cannot 'reasonably be said . . . to be [beyond] the scope of

[his] legal authority,' Code § 9-6.14:17." *York Street Inn*, 220 Va. at 316, 257 S.E.2d at 855.

We therefore hold that the Commissioner's adoption of a seventy-five percent minimum occupancy standard under the SHP was not arbitrary and capricious, that the national guidelines are, at a minimum, suggestive, and the Commissioner may properly consider the guidelines when exercising discretion given to him by the General Assembly.

## V.

Whether the trial court erred in holding that the Commissioner may rely upon the State Medical Facilities Plan and the statistical methodologies contained therein, which Johnston-Willis contends are inaccurate, inadequate or outdated.

Johnston-Willis contends that it presented unrebutted evidence that the statistical projections relied upon by the Commissioner were inaccurate, outdated, or inadequate, and that consequently, the Commissioner, pursuant to Code § 32.1-102.3, should have issued the CON. In support of its position Johnston-Willis argues that the Commissioner erroneously employed the Poisson distribution methodology formula, a statistical distribution technique established in the 1984 SMFP, to project obstetrical bed need. Johnston-Willis also argues that the SHP indicates a preference for planning on the basis of medical service areas rather than planning districts, and that the Commissioner's decision was erroneously based on a policy of planning by planning districts.

Johnston-Willis would have us hold that the language of Code § 32.1-102.3(A) requires the Commissioner to disregard the SHP and SMFP if any evidence is presented that the provisions of either plan are inaccurate, outdated, or inadequate. The language of Code § 32.1-102.3(A) is an exception to the initial mandatory language of the statute. The statute provides that "*if* the Commissioner finds *upon presentation of appropriate evidence,*" that the plans are inaccurate, outdated, inadequate or otherwise inapplicable, the Commissioner may issue a CON (emphasis added). Accordingly, the statute vests the Commissioner with the authority and the discretion to make an initial determination as to whether either the SHP or SMFP is inaccurate, outdated, inadequate or otherwise inapplicable.

The Commissioner's decision on whether the SHP or SMFP is inaccurate, outdated, inadequate or otherwise inapplicable, is a decision within the specialized competence of the Commissioner and is entitled to special weight in the courts. For that reason "judicial interference is permissible only for relief against the arbitrary and capricious action that constitutes a clear abuse of the delegated discretion." *York Street Inn*, 220 Va. at 315, 257 S.E.2d at 855 (citation omitted).

Johnston-Willis' statistical expert, Dr. Richard Tompkins, testified that although the Poisson distribution technique is an appropriate technique to use in projecting obstetrical bed need, the technique could not properly be used to project need on a regional or planning district basis, as is done in the 1984 SMFP, but should be applied on an institutional basis. Johnston-Willis claims that "[i]t is arbitrary and capricious [for the Commissioner] to employ a regulatory standard that is founded on an incorrect use of a specified statistical technique." Therefore, Johnston-Willis argues, the Commissioner should have ruled that the 1984 SMFP is inaccurate and should have issued a CON.

The Commissioner considered these arguments challenging the use of the Poisson distribution technique and refused to set aside the statistical methodology and the manner in which it was applied. We cannot say that the Commissioner's decision was arbitrary and capricious and, therefore, erroneous as a matter of law. The SHP has explicitly adopted a planning approach based upon health service area and planning districts. Relevant information and data are gathered, compiled and summarized on a health service area and planning district basis. Projections of need are based on these statistics. Dr. Tompkins stated that he explicitly applied the state's methodology, with one exception. He applied the Poisson distribution technique to each individual hospital in the "metropolitan" area as opposed to all hospitals simultaneously in the "metropolitan" area.

To hold that the Commissioner should disregard the method in which the Poisson distribution is applied, and decide that this statistical technique should be applied on an institutional basis rather than a planning district basis, is not only contrary to the planning purposes underlying the SHP and SMFP, it is also inherently illogical. Planning is not done on an institutional basis, and to do so would defeat the very purposes for which the SHP and SMFP

were enacted.

As to Johnston-Willis' assertion that the SHP indicates a preference for medical service areas rather than planning districts, this assertion is without merit and is based upon Johnston-Willis' selective removal of certain phrases of the SHP so that they are taken out of context. In fact, the SHP identifies planning districts as service areas for facilities within the boundaries of the planning districts.

Until appropriate data (i.e., patient origin information) are available regarding patient travel time for medical services, true medical service areas cannot be defined and institution based planning techniques cannot be utilized. Therefore, a method must be adopted which defines alternative planning units which approximate medical service areas. The medical service areas served by health system agencies are generally too large for effective planning in relation to the types of services considered and the nature and purpose of this plan . . . . Planning districts represent a compromise solution.

The definition of each planning district takes into consideration such factors as population distribution, natural geographic boundaries, trade centers, political boundaries, and transportation resources. As such, these planning districts allow for recognition of local diversity in the medical practice and consumer utilization of health facilities and services throughout the state. These districts are the basis for collection, organization and analysis of data on health and medical care facilities and are used by the state agency and the health system agencies in fulfilling their health planning functions. [I]n most cases for a given institution, the residents of the planning district in which it is located represent the largest identifiable portion of its target service population. For these reasons, *each of the twenty-two planning districts in the state are considered to represent the service areas of those facilities within their boundaries* (emphasis added).

1984 State Health Plan, Vol. 2 at 108-09.

We do not agree with Johnston-Willis' interpretation of this portion of the SHP. The plan recognizes the problems in defining

medical service areas, and it states that planning districts represent a compromise solution. Further, the health plan concludes that planning districts in the state are considered to represent the service areas for those facilities within their boundaries. Thus, we believe, the SHP defines the medical service areas as planning districts.

## VI.

Whether the trial court erred in holding that the Commissioner, consistent with the notice requirements of Code § 9-6.14:11, properly considered extra-record data.

Johnston-Willis contends that the Commissioner may not rely upon extra-record data of which Johnston-Willis had no notice prior to the receipt of the adverse decision. Johnston-Willis contends the Commissioner violated Code § 9-6.14:11, which provides in pertinent part, that parties in a formal fact-finding conference have the right "to have notice of any contrary facts, basis or information in the possession of the agency upon which it may rely in any way in making an adverse decision." Johnston-Willis argues that the Commissioner failed to notify it of his intent to apply a seventy-five percent occupancy standard; that the Commissioner relied upon a time travel study conducted by the hearing officer's staff after closure of the record, which Johnston-Willis had no notice of or opportunity to rebut; and that the Commissioner failed to notify Johnston-Willis of his intent to rely upon information concerning a hospital in Planning District 14 and information concerning birth and fertility rates.

As we have previously held in this opinion, the Commissioner properly relied on a seventy-five percent occupancy standard for obstetrical service units such as the one Johnston-Willis proposed. We do not believe that the Commissioner's use of this standard is a "fact" within the meaning of Code § 9-6.14:11; rather, we conclude that it is a regulatory guideline. We note that in other case decisions concerning CON applications for obstetrical units, the Commissioner explicitly adopted the seventy-five percent occupancy standard. Under Code § 9-6.14:14 these final decisions remain in the custody of the agency's public records subject to judicial notice by all courts and agencies. Johnston-Willis produced numerous witnesses who testified as to the proper occu-

pancy standard. Certainly the Commissioner has the right, indeed the duty, to address this crucial issue in determining, within the authority granted by the legislature and subject to the applicable rules and regulations, the proper occupancy standard. "[A]n administrative agency will act appropriately . . . upon the record presented and such matters as properly may receive its attention through 'official notice.'" *United States v. Pierce Auto Freight Lines, Inc.*, 327 U.S. 515, 529-30 (1946)(footnote omitted).

We agree with Johnston-Willis that the hearing officer improperly considered a travel time study conducted by the hearing officer's staff. The record on the informal fact-finding conference was closed by the hearing officer on December 3, 1984, yet the travel time study was conducted on November 29, 1984 and December 4, 1984. Johnston-Willis was not given notice of this information and had no opportunity to rebut it. We agree that the consideration of this extra-record evidence was improper. However, we do not believe that this error warrants reversal.

██ Members of an administrative body cannot decide issues on personal knowledge, but must rely upon the evidence produced before them. *Skyline Swannanoa, Inc. v. Nelson County*, 186 Va. 878, 886, 44 S.E.2d 437, 441 (1947). However, the rules of evidence are relaxed in an administrative proceeding and the findings will not be reversed solely because the Commissioner considered evidence not in the record. *Cf. Bias*, 226 Va. at 270, 308 S.E.2d at 126. "[T]he mere fact that the [agency] has looked beyond the record does not invalidate its action unless substantial prejudice is shown to result." *Pierce Auto Freight Lines*, 327 U.S. at 530 (citations omitted). "No reversible error will be found . . . unless there is a clear showing of prejudice arising from the admission of such evidence, or unless it is plain that the agency's conclusions were determined by the improper evidence, and that a contrary result would have been reached in its absence." *Bias*, 226 Va. at 270, 308 S.E.2d at 126 (citing *Norfolk and Western Railway Co. v. Commonwealth*, 162 Va. 314, 322-23, 174 S.E. 85, 88 (1934)).

We cannot say that substantial prejudice was shown or that the Commissioner would have reached a contrary result in the absence of his consideration of the travel time study. The Commissioner's decision was based on a multitude of factors, including the applicable provisions of the SHP and SMFP, and those enumerated in Code § 32.1-102.3(B). We do not believe the travel

time study was dispositive. We therefore hold that although the hearing officer should not have considered the extra-record travel time study, it was harmless error to have done so.

We also do not believe that the Commissioner's reference to and potential reliance upon information concerning Planning District 14 and the hospital located therein, and information concerning birth fertility rates, violated Code § 9-6.14:11. The primary service area of Johnston-Willis has historically included the Counties of Chesterfield, Powhatan, Amelia, and Nottoway. These counties are located in Planning District 14 and Planning District 15. We fail to see how the Commissioner's reference to Planning District 14 and the hospitals located therein would have in any way prejudiced Johnston-Willis. Furthermore, we cannot say that had the hearing officer not referred to Planning District 14 in the report adopted by the Commissioner a contrary result would have been reached.

Finally, the data concerning the birth and fertility rates was received from the Virginia Center for Health Statistics. The Center for Health Statistics was created specifically to perform data program development and reports for the Department of Health, and the director is directed to collect health-related records and reports and prepare, tabulate, analyze, and publish vital statistics and such other reports as may be required by the Commissioner or Board of Health. Code § 32.1-276.1. We believe it was entirely proper for the Commissioner to rely upon these public statistics.

## VII.

Regardless of the projections of surplus beds under the provisions of the State Medical Facilities Plan, whether Johnston-Willis is entitled to a certificate of need under the provisions of the State Health Plan.

Johnston-Willis contends, assuming *arguendo* the projections of surplus beds in the SMFP were accurate, that it was nonetheless entitled to a CON under a particular provision of the SHP which provides:

The State-Wide Health Coordinating Council and the State Health Department should, for those areas where a surplus

of obstetrical beds are projected, encourage and recommend approval of certificate of need applications which (1) propose no new bed construction, (2) limit the renovation of existing beds to the extent possible, and (3) indicate that other alternatives for reducing underutilized beds have been thoroughly investigated.

Johnston-Willis admits that the Commissioner addressed this provision of the SHP, but it challenges the correctness of the Commissioner's conclusion.

The Commissioner addressed each of these factors stipulated in the provision and concluded:

> While the construction of the JWH project involves no new beds [1], it involves substantial new construction and a substantial capital expenditure. Part B [2] of the SHP policy is not relevant to the project. Concerning Part C [3], the JWH project may represent an approach for improving utilization of the total bed capacity at JWH. However, the record also shows that the proposed project will negatively impact several existing OB programs where the utilization is declining. To that extent the proposed project does not represent an alternative for reducing underutilized beds in the planning district or area to be served by JWH.

The Commissioner further concluded that "while the JWH project will not add new beds to the system or hospital, considerable construction will be undertaken involving a substantial expenditure. Such action clearly violates the intent of the plan to minimize cost associated with establishing new services and avoiding construction when a surplus of beds exist."

Johnston-Willis asserts that the Commissioner's statement as to the new construction expense is irrelevant to the issue of whether the first criterion is satisfied. Both parties agree that the second criterion is not relevant. As to the third criterion, Johnston-Willis contends the Commissioner misunderstands the requirements of the SHP. Johnston-Willis argues that the third criterion, which provides a CON applicant should thoroughly investigate other alternatives for reducing underutilized beds, requires only that an applicant investigate alternatives for reducing beds within the in-

stitution, not the entire planning district.

The gist of Johnston-Willis' contention on this issue is that: (1) the provision of the SHP is "more specific" than the SMFP and therefore is controlling; and (2) had the Commissioner properly interpreted this provision of the SHP he would be required to issue the requested CON. We disagree.

While the SHP is a planning and development blueprint for the health activities of the Commonwealth and forms the foundation upon which the Commissioner operates, and the SMFP provides the statistical updates describing the current and future status of health care services and facilities in the Commonwealth, Code § 32.1-102(3)(B) contains the mandatory criteria upon which the Commissioner is to determine whether a public need for a given project has been demonstrated and consequently whether to issue a CON. Therefore, the proper determination is not whether the SHP is more specific than the SMFP, but rather whether the Commissioner's interpretation of the SHP and its application to a proposed project is consistent with his statutory mandate.

Johnston-Willis' second contention raises an issue of law involving an interpretation by the Commissioner which falls within his specialized competence and to which he has been entrusted with wide discretion. It is, accordingly, entitled to special weight in the courts. In this context, the relief which Johnston-Willis seeks is available only for arbitrary and capricious action by the Commissioner that constitutes a clear abuse of his discretion. *York Street Inn*, 220 Va. at 315, 257 S.E.2d at 855.

Our decision in *Roanoke Memorial Hospitals v. Kenley*, 3 Va. App. 599, 352 S.E.2d 525 (1987), establishes that the SHP confers an appropriate amount of discretionary authority in the Commissioner. Accordingly, the provision of the SHP upon which Johnston-Willis relies is not mandatory upon the Commissioner. For that reason, even under Johnston-Willis' interpretation of the SHP, the Commissioner would not necessarily be required to issue the CON in this case.

We review the Commissioner's denial of the CON then in the context of his allowable discretion under the SHP and the provisions of Code § 32.1-102.3. Under both of these, minimizing costs and charges to the public for providing health services by other

persons in the area and avoiding construction when a surplus of beds exists were valid considerations by the Commissioner. Accordingly, even though Johnston-Willis' contention that it could not "indicate that other alternatives for reducing underutilized beds" other than in its own institution has logical appeal, we cannot say that the Commissioner abused his discretion in finding that the costs of the project warranted his denial of the project. We believe this conclusion is particularly appropriate where, as here, Johnston-Willis is proposing new obstetrical services.

## VIII.

Whether the trial court erred in holding that the Commissioner's decision to deny a certificate of need in this case was based upon substantial evidence.

Lastly, we turn to the issue of whether the Commissioner's decision to deny the CON is supported by substantial evidence in the record. Johnston-Willis contends that its evidence at the informal fact-finding conference went unchallenged and was unrebutted. Johnston-Willis asserts that the Commissioner ignored certain unrebutted evidence of record, and that the Commissioner made findings of fact and conclusions not supported by credible evidence of record.

The standard of review is well defined under the VAPA and case decisions. Where the issue is the substantiality of the evidential support for findings of facts, "the sole determination by the reviewing court . . . is whether there was substantial evidence in the agency record to support the agency decision." *State Board of Health v. Godfrey*, 223 Va. 423, 435, 290 S.E.2d 875, 881 (1982). "The phrase 'substantial evidence' refers to 'such relevant evidence as a reasonable mind *might* accept as adequate to support a conclusion.'" *Bias*, 226 Va. at 269, 308 S.E.2d at 125 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "[T]he court may reject the agency's findings of fact 'only if, considering the record as a whole, a reasonable mind would necessarily come to a different conclusion.'" *Id.* at 269, 308 S.E.2d at 125 (quoting B. Mezines, *Administrative Law* § 51.01 (1981)). This standard "is designed to give great stability and finality to the fact findings of an administrative agency." *Id.* at 269, 308 S.E.2d at 125.

The determination of an issue of fact is to be made solely on the basis of the whole evidentiary record provided by the agency and the reviewing court is limited to that agency record. Code § 9-6.14:17; *Godfrey*, 223 Va. at 433, 290 S.E.2d at 880. "A reviewing court may not, however, use its review of an agency's procedures as a pretext for substituting its judgment for the agency on factual issues decided by the agency." *Id.* at 434, 290 S.E.2d at 881 (citations omitted). A reviewing court "must review the facts in the light most favorable to sustaining the [agency's] action," *Bio-Medical Applications of Arlington, Inc. v. Kenley*, 4 Va. App. 414, 417, 358 S.E.2d 722, 729 (1987), and "take due account of the presumption of official regularity, the experience and specialized competence of the agency, and the purposes of the basic law under which the agency has acted." *York Street Inn*, 220 Va. at 313, 257 S.E.2d at 853.

Applying these guiding principles to the entire record before us, we find that there was substantial and relevant evidence adequate to support the Commissioner's conclusion. The hearing officer's report contained forty-three findings of fact and a general discussion of the proposal. The report addressed the consistency of the proposed project with the SHP and SMFP, accessibility of OB services within Planning District 15, the impact the proposal would have on existing facilities, and the twenty statutory factors enumerated in Code § 32.1-102.3(B). We need not recite every fact and every conclusion reached by the Commissioner. Rather, we believe we must review those facts and conclusions central to the Commissioner's decision and review the reasons Johnston-Willis asserted for the establishment of new obstetrical services.

## A. Need for Obstetrical Services

Johnston-Willis asserts that its proposal would provide sufficient bed capacity to meet the projected 1989 demand for obstetrical services in Planning District 15. The Commissioner concluded that the need to add obstetrical beds had not been demonstrated given the unused capacity at existing Planning District 15 hospitals with obstetrical units. The Commissioner further concluded that the proposal was inconsistent with the OB bed need projected in the 1984 SMFP, which shows a surplus of beds in Planning District 15. Reviewing the facts in the light most favorable to sustaining the Commissioner's decision, there is relevant evidence in

the record to support the Commissioner's findings. Certainly, we cannot say a reasonable mind would necessarily come to a different conclusion.

The 1984 SMFP projects a need for 207 OB beds by 1989, while there are currently 217 existing OB beds, resulting in a surplus of ten beds. A draft update of the SMFP indicates an expected surplus of fourteen OB beds in Planning District 15 by 1990. As the Commissioner further noted, three of the five hospitals in Planning District 15 have occupancy rates below seventy-five percent. Richmond Memorial Hospital, located 13.9 miles from Johnston-Willis, had an estimated occupancy rate in 1984 of 28.1 percent. St. Mary's Hospital, located 9.3 miles from Johnston-Willis, had an occupancy rate of 58.7 percent in 1984. Chippenham Hospital, located some 6 miles from Johnston-Willis, had an occupancy rate of 63.6 percent in 1984, and the number of deliveries declined from 1909 in 1983 to 1777 in 1984. We recognize that the decline in Chippenham's occupancy rate from 1983 to 1984 was caused by an increase in the number of that hospital's obstetrical beds. However, the decline in the actual number of deliveries and the remaining capacity at Chippenham Hospital certainly provide potential obstetrical services for child-bearing mothers in Johnston-Willis' primary service area.

### B. Access and Traffic Congestion

Although it is true that Johnston-Willis presented evidence that traffic density and congestion in Chesterfield County and the surrounding area which Johnston-Willis serves has increased dramatically because of high growth, this fact standing alone does not justify approval of its project. The Commissioner acknowledged that population and commercial growth have effected traffic congestion in the area. However, the record supports the Commissioner's conclusion that Johnston-Willis failed to show that this congestion has caused frequent delays for patients seeking obstetrical services and that the health and well-being of expectant mothers have been endangered because of traffic congestion.

None of the doctors testifying on behalf of Johnston-Willis provided an example based on first-hand knowledge of any incidents where traffic congestion caused delays representing a danger to patients' health. Dr. Erica Blanton, when asked whether her pa-

tients had experienced problems occasioned by traffic congestion, testified: "I don't think so, they are conscious [sic] enough to get in touch with us in time to avoid problems like that." Dr. Peter Blakey testified that mothers sometimes choose to "cross the river" and go to Henrico Doctor's or St. Mary's to deliver because they perceive that the care is somehow better in these hospitals. However, a reading of Dr. Blakey's testimony reveals that he emphasized the inconvenience for the physicians treating mothers who choose to go to west end hospitals. He testified that these mothers "sometimes jeopardized theirs' and their fetus' health," and "I think we'll increasingly see infants and mothers who get themselves in trouble." Other than this speculative testimony, there is no evidence that residents of Johnston-Willis' service area are not receiving timely and quality services in existing hospitals with OB units.

Adding an OB unit to Johnston-Willis may certainly be more convenient for mothers in Johnston-Willis' service area. However, convenience is not the sole basis upon which to make decisions of this kind. We believe that the record fully supports the Commissioner's conclusion.

C. Negative Impact on Other Planning District 15 Hospitals and Health System costs.

Johnston-Willis argues that the Commissioner's conclusion that its proposed obstetrical unit would negatively affect the overall occupancy of existing obstetrical units in Planning District 15 was not supported by substantial evidence in the record. We reject Johnston-Willis' argument and find that the record contains substantial evidence such as a reasonable mind might accept as adequate to support the Commissioner's conclusion.

The Commissioner acknowledged that the negative effect on the existing OB units cannot be determined with certainty. However, it is apparent, as the Commissioner concluded, that "because virtually all of the obstetricians that are currently on the staff at Chippenham Hospital would also be on the staff at Johnston-Willis Hospital and such physicians would thereby offer patients that now deliver at Chippenham Hospital a choice [of delivery at either Johnston-Willis or Chippenham], a significant number of births would shift to Johnston-Willis Hospital." Thus,

Chippenham Hospital's obstetrical occupancy would necessarily be adversely affected.

The hearing officer inquired specifically into whether the Johnston-Willis proposal would negatively affect other Planning District 15 hospitals. When being questioned as to whether Johnston-Willis would capture patients now crossing the river to go the west end hospitals, Dr. Crooks testified: "I would think there would be some impact on the west end hospitals." Dr. Blakey candidly testified that he hoped the proposed Johnston-Willis unit would "draw babies from another place." He stated that if the patients choose the Johnston-Willis OB unit, "that would, of necessity, dilute them from St. Mary's and Henrico Doctor's Hospital." This negative effect was of great concern to the Commissioner and we believe the record supports his conclusion. Adding a twenty bed obstetrical unit at Johnston-Willis would necessarily reduce the occupancy at other Planning District 15 hospital obstetrical units.

A closely related issue is the increased costs to the health system in general and to Johnston-Willis in particular. The SHP provides:

> Excess bed capacity has important implications for the overall cost of delivering health services. Charges for hospital-based services remain the dominant component of health care expenditures in this country . . . . Beds which are not effectively utilized generally requires [sic] only slightly lower levels of maintenance than those which are fully utilized in providing care to patients.

1984 State Health Plan, Vol. 1 at 441.

Thus, when OB beds are not effectively utilized and occupancy at a given unit is reduced, certain fixed costs remain and the overall cost to the patient is increased. Adding an obstetrical unit at Johnston-Willis, containing twenty additional beds, will negatively affect costs in other existing OB units because their occupancy will be reduced without a corresponding reduction in certain fixed costs.

Johnston-Willis has made much of the fact that it is removing from service 20 medical/surgical beds, which are underutilized, and adding 20 obstetrical beds. Notwithstanding this fact,

Johnston-Willis' proposal is not a conversion in the strictest sense. It is true that the licensed capacity of Johnston-Willis will remain constant. However, Johnston-Willis' proposal provides for an addition of a wing to its hospital, not a straight conversion of the existing 20 medical/surgical beds into 20 obstetrical beds.

It is laudatory that Johnston-Willis wishes to remove underutilized beds from service and this decision on the part of Johnston-Willis is certainly supported by the SHP. However, just because Johnston-Willis proposes to "convert" beds, by removing 20 surgical beds from service and utilize its fifth floor for consolidation of rehabilitative services, does not mean that the proposal is consistent with the SHP. The Commissioner concluded that "[w]hile the [Johnston-Willis Hospital] project will not add new beds to the system or hospital, considerable construction will be undertaken involving a substantial expenditure. Such action clearly violates the intent of the Plan to minimize costs associated with establishing new services and avoiding construction when a surplus of beds exist." The Commissioner concluded that the proposed project would not improve accessibility to the degree necessary to justify the expenditure of 4.7 million dollars.

The primary purposes of the CON program are to restrain costs and prevent duplication of health care services so that available resources will be effectively utilized. Our review of the record convinces us that Johnston-Willis' proposal would thwart these purposes by adding unjustified costs to the health system which will ultimately be passed onto the health care consumers. We believe there was substantial evidence to support the Commissioner's conclusion that Johnston-Willis' proposal would negatively affect existing OB units and negatively affect costs.

Therefore, based upon our review of the evidence and the entire agency record, we hold that the Commissioner's decision was supported by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Furthermore, we believe the Commissioner adequately addressed each factor which Code § 32.1-102.3 mandates and that he adequately explained his rationale in reaching his decision.

*Affirmed.*

Baker, J., and Benton, J., concurred.